# ANSONIA BOARD OF EDUCATION ET AL.
## *v.* PHILBROOK ET AL.

No. 85–495.   Argued October 14, 1986—Decided November 17, 1986

REHNQUIST, C. J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, POWELL, O'CONNOR, and SCALIA, JJ., joined. MARSHALL, J., *post*, p. 71, and STEVENS, J., *post*, p. 75, filed opinions concurring in part and dissenting in part.

*Thomas N. Sullivan* argued the cause for petitioners. With him on the briefs was *Robert J. Murphy*. *Robert F. McWeeny* argued the cause and filed a brief for Ansonia Fed-

eration of Teachers, respondent under this Court's Rule 19.6, in support of petitioners.

*David N. Rosen* argued the cause for respondent Philbrook. With him on the brief was *Paul Gewirtz.*

*Solicitor General Fried* argued the cause for the United States et al. as *amici curiae* urging affirmance. With him on the brief were *Assistant Attorneys General Reynolds* and *Willard, Deputy Solicitor General Carolyn B. Kuhl, Deputy Assistant Attorney General Carvin, Richard J. Lazarus, Brian K. Landsberg, Louise A. Lerner,* and *Johnny J. Butler.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioner Ansonia Board of Education has employed respondent Ronald Philbrook since 1962 to teach high school business and typing classes in Ansonia, Connecticut. In 1968, Philbrook was baptized into the Worldwide Church of God. The tenets of the church require members to refrain from secular employment during designated holy days, a

---

*Briefs of *amici curiae* urging reversal were filed for the American Federation of Labor and Congress of Industrial Organizations by *Michael H. Gottesman, David M. Silberman,* and *Laurence Gold;* and for the Equal Employment Advisory Council et al. by *Robert E. Williams, Douglas S. McDowell, William S. Franklin, August W. Steinhilber, Gwendolyn H. Gregory,* and *Thomas A. Shannon.*

Briefs of *amici curiae* urging affirmance were filed for the State of Connecticut by *Joseph I. Lieberman,* Attorney General, *Clarine Nardi Riddle,* Deputy Attorney General, *Henry S. Cohn* and *Robert B. Teitelman,* Assistant Attorneys General, and *Philip A. Murphy, Jr.;* for the American Jewish Congress et al. by *Marc D. Stern* and *Ronald A. Krauss;* for the Catholic League for Religious and Civil Rights by *Steven Frederick McDowell;* for the Council on Religious Freedom by *Lee Boothby, James M. Parker,* and *Robert W. Nixon;* for the General Conference of Seventh-day Adventists by *Walter E. Carson;* for the Presbyterian Church (USA) et al. by *Douglas Laycock, Samuel E. Ericsson, Michael J. Woodruff,* and *Kimberlee Wood Colby;* and for the Rutherford Institute et al. by *W. Charles Bundren, Guy O. Farley, Jr., Larry L. Crain, Thomas O. Kotouc, Alfred Lindh, William B. Hollberg,* and *Wendell R. Bird.*

practice that has caused respondent to miss approximately six schooldays each year. We are asked to determine whether the employer's efforts to adjust respondent's work schedule in light of his belief fulfill its obligation under § 701 (j) of the Civil Rights Act of 1964, 86 Stat. 103, 42 U. S. C. § 2000e(j), to "reasonably accommodate to an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business."[1]

Since the 1967–1968 school year, the school board's collective-bargaining agreements with the Ansonia Federation of Teachers have granted to each teacher 18 days of leave per year for illness, cumulative to 150 and later to 180 days. Accumulated leave may be used for purposes other than illness as specified in the agreement. A teacher may accordingly use five days' leave for a death in the immediate family, one day for attendance at a wedding, three days per year for attendance as an official delegate to a national veterans organization, and the like. See, e. g., App. 98–99. With the exception of the agreement covering the 1967–1968 school year, each contract has specifically provided three

---

[1] The reasonable accommodation duty was incorporated into the statute, somewhat awkwardly, in the definition of religion. Title VII's central provisions make it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ," § 703(a)(1), 42 U. S. C. § 2000e–2(a)(1), or "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . religion . . . ." § 703(a)(2), 42 U. S. C. § 2000e–2(a)(2). Section 701(j), 42 U. S. C. § 2000e(j), was added in 1972 to illuminate the meaning of religious discrimination under the statute. It provides that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

days' annual leave for observance of mandatory religious holidays, as defined in the contract. Unlike other categories for which leave is permitted, absences for religious holidays are not charged against the teacher's annual or accumulated leave.

The school board has also agreed that teachers may use up to three days of accumulated leave each school year for "necessary personal business." Recent contracts limited permissible personal leave to those uses not otherwise specified in the contract. This limitation dictated, for example, that an employee who wanted more than three leave days to attend the convention of a national veterans organization could not use personal leave to gain extra days for that purpose. Likewise, an employee already absent three days for mandatory religious observances could not later use personal leave for "[a]ny religious activity," *id.*, at 80, 83, 86, 89, 92, or "[a]ny religious observance." *Id.*, at 96, 100. Since the 1978–1979 school year, teachers have been allowed to take one of the three personal days without prior approval; use of the remaining two days requires advance approval by the school principal.

The limitations on the use of personal business leave spawned this litigation. Until the 1976–1977 year, Philbrook observed mandatory holy days by using the three days granted in the contract and then taking unauthorized leave. His pay was reduced accordingly.[2] In 1976, however, respondent stopped taking unauthorized leave for religious reasons, and began scheduling required hospital visits on church holy days. He also worked on several holy days. Dissatisfied with this arrangement, Philbrook repeatedly asked the school board to adopt one of two alternatives. His preferred alternative would allow use of personal business leave for religious observance, effectively giving him three addi-

---

[2] Absence for reasons not contemplated by the contract resulted in a proportionate deduction from pay; since 1971, 1/180 of annual salary had been deducted for each day of unexcused absence. App. 84, 90, 93, 97, 101.

tional days of paid leave for that purpose. Short of this arrangement, respondent suggested that he pay the cost of a substitute and receive full pay for additional days off for religious observances.[3] Petitioner has consistently rejected both proposals.

In 1973 Philbrook filed a complaint with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission against the school board and the Ansonia Federation of Teachers. After exhausting the available administrative avenues, he filed a complaint in the United States District Court for the District of Connecticut, alleging that the prohibition on the use of "necessary personal business" leave for religious observance violated §§ 703(a)(1), (2) of Title VII, 42 U. S. C. §§ 2000e–2(a)(1), (2), and seeking both damages and injunctive relief.[4]

After a 2-day trial, the District Court concluded that Philbrook had failed to prove a case of religious discrimination because he had not been placed by the school board in a position of violating his religion or losing his job.

The Court of Appeals for the Second Circuit reversed and remanded for further proceedings. It held that a prima facie case of discrimination is established when an employee shows that

"'(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting em-

---

[3] The suggested accommodation would reduce the financial costs to Philbrook of unauthorized absences. In 1984, for example, a substitute cost $30 per day, and respondent's loss in pay from an unauthorized absence was over $130.

[4] Philbrook's complaint also alleged that petitioner Board's policies and practices violated his free exercise rights under the First Amendment. Because the Court of Appeals remanded the Title VII claim for further proceedings, it did not address Philbrook's First Amendment claims, and we have no occasion to consider them here.

ployment requirement.' " 757 F. 2d 476, 481 (1985), quoting *Turpen* v. *Missouri-Kansas-Texas R. Co.*, 736 F. 2d 1022, 1026 (CA5 1984).

Philbrook established his case, the court held, by showing that he had a sincere religious belief that conflicted with the employer's attendance requirements, that the employer was aware of the belief, and that he suffered a detriment— namely, a loss of pay—from the conflict.[5] The court then assumed that the employer's leave policy constituted a reasonable accommodation to Philbrook's belief. It held, however, that "[w]here the employer and the employee each propose a reasonable accommodation, Title VII requires the employer to accept the proposal the employee prefers unless that accommodation causes undue hardship on the employer's conduct of his business." 757 F. 2d, at 484. The Court of Appeals remanded for consideration of the hardship that would result from Philbrook's suggestions.

We granted certiorari to consider the important questions of federal law presented by the decision of the Court of Appeals. 474 U. S. 1080 (1986). Specifically, we are asked to address whether the Court of Appeals erred in finding that Philbrook established a prima facie case of religious discrimination and in opining that an employer must accept the employee's preferred accommodation absent proof of undue hardship. We find little support in the statute for the approach adopted by the Court of Appeals, but we agree that the ultimate issue of reasonable accommodation cannot be resolved without further factual inquiry. We accordingly affirm the judgment of the Court of Appeals remanding the case to the District Court for additional findings.

---

[5] Judge Pollack, Senior District Judge of the Southern District of New York sitting by designation, dissented. He agreed with the District Court that "[t]he School Board's policy neither deprives the plaintiff of employment opportunities nor adversely affects his employment status." 757 F. 2d, at 489. Accordingly, he found that the policy did not " 'discriminate' within Title VII's use and meaning of that term . . . ." *Ibid.*

As we noted in our only previous consideration of § 701(j), its language was added to the 1972 amendments on the floor of the Senate with little discussion. *Trans World Airlines, Inc.* v. *Hardison,* 432 U. S. 63, 74, n. 9 (1977). See 118 Cong. Rec. 705–706 (1972). In *Hardison, supra,* at 84, we determined that an accommodation causes "undue hardship" whenever that accommodation results in "more than a *de minimis* cost" to the employer. Hardison had been discharged because his religious beliefs would not allow him to work on Saturdays and claimed that this action violated the employer's duty to effect a reasonable accommodation of his beliefs. Because we concluded that each of the suggested accommodations would impose on the employer an undue hardship, we had no occasion to consider the bounds of a prima facie case in the religious accommodation context or whether an employer is required to choose from available accommodations the alternative preferred by the employee. The employer in *Hardison* simply argued that all conceivable accommodations would result in undue hardship, and we agreed.

Petitioner asks us to establish for religious accommodation claims a proof scheme analogous to that developed in other Title VII contexts, delineating the plaintiff's prima facie case and shifting production burdens. See *Texas Dept. of Community Affairs* v. *Burdine,* 450 U. S. 248 (1981); *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973). But the present case raises no such issue. As in *United States Postal Service Board of Governors* v. *Aikens,* 460 U. S. 711 (1983), the defendant here failed to persuade the District Court to dismiss the action for want of a prima facie case, and the case was fully tried on the merits. We held in *Aikens* that these circumstances place the ultimate Title VII question of discrimination *vel non* directly before the court. "Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer rele-

vant." *Id.*, at 715. We may therefore proceed to the question whether the employer's proposed accommodation of respondent's religious practices comports with the statutory mandate of § 701(j).

In addressing this question, the Court of Appeals assumed that the employer had offered a reasonable accommodation of Philbrook's religious beliefs. This alone, however, was insufficient in that court's view to allow resolution of the dispute. The court observed that the duty to accommodate "cannot be defined without reference to undue hardship." 757 F. 2d, at 484. It accordingly determined that the accommodation obligation includes a duty to accept "the proposal the employee prefers unless that accommodation causes undue hardship on the employer's conduct of his business." *Ibid.* Cf. *American Postal Workers Union* v. *Postmaster General*, 781 F. 2d 772, 776 (CA9 1986) (Title VII does not dictate that "an employer must accept any accommodation, short of 'undue hardship,' proposed by an employee . . ."). Because the District Court had not considered whether Philbrook's proposals would impose undue hardship, the Court of Appeals remanded for further consideration of those proposals.

We find no basis in either the statute or its legislative history for requiring an employer to choose any particular reasonable accommodation. By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation. The employer violates the statute unless it "demonstrates that [it] is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U. S. C. § 2000e(j). Thus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship. As *Hardison* illustrates, the extent of

undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship.   Once the Court of Appeals assumed that the school board had offered to Philbrook a reasonable alternative, it erred by requiring the Board to nonetheless demonstrate the hardship of Philbrook's alternatives.

The legislative history of § 701(j), as we noted in *Hardison, supra,* at 74–75, and n. 9, is of little help in defining the employer's accommodation obligation.   To the extent it provides any indication of congressional intent, however, we think that the history supports our conclusion.   Senator Randolph, the sponsor of the amendment that became § 701(j), expressed his hope that accommodation would be made with "flexibility" and "a desire to achieve an adjustment."   118 Cong. Rec. 706 (1972).   Consistent with these goals, courts have noted that "bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business."   *Brener* v. *Diagnostic Center Hospital,* 671 F. 2d 141, 145–146 (CA5 1982).   See also *American Postal Workers, supra,* at 777.   Under the approach articulated by the Court of Appeals, however, the employee is given every incentive to hold out for the most beneficial accommodation, despite the fact that an employer offers a reasonable resolution of the conflict.   This approach, we think, conflicts with both the language of the statute and the views that led to its enactment.   We accordingly hold that an employer has met its obligation under § 701(j) when it demonstrates that it has offered a reasonable accommodation to the employee.[6]

---

[6] The Court of Appeals found support for its decision in the EEOC's guidelines on religious discrimination.   757 F. 2d, at 485, and n. 7.   Specifically, the guidelines provide that "when there is more than one means of accommodation which would not cause undue hardship, the employer . . . must offer the alternative which least disadvantages the individual with re-

The remaining issue in the case is whether the school board's leave policy constitutes a reasonable accommodation of Philbrook's religious beliefs. Because both the District Court and the Court of Appeals applied what we hold to be an erroneous view of the law, neither explicitly considered this question. We think that there are insufficient factual findings as to the manner in which the collective-bargaining agreements have been interpreted in order for us to make that judgment initially. We think that the school board policy in this case, requiring respondent to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one. In enacting § 701(j), Congress was understandably motivated by a desire to assure the individual additional opportunity to observe religious practices, but it did not impose a duty on the employer to accommodate at all costs. *Trans World Airlines, Inc.* v. *Hardison,* 432 U. S. 63 (1977). The provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work. Generally speaking, "[t]he direct effect of [unpaid leave] is merely a loss of income for the period

---

spect to his or her employment opportunities." 29 CFR § 1605.2(c)(2)(ii) (1986). Though superficially consistent with the burden imposed by the Court of Appeals, this guideline, by requiring the employer to choose the option that least disadvantages an individual's *employment opportunities,* contains a significant limitation not found in the court's standard. To the extent that the guideline, like the approach of the Court of Appeals, requires the employer to accept any alternative favored by the employee short of undue hardship, we find the guideline simply inconsistent with the plain meaning of the statute. We have, of course, noted that EEOC guidelines are properly accorded less weight than administrative regulations declared by Congress to have the force of law. *General Electric Co.* v. *Gilbert,* 429 U. S. 125, 141 (1976); *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 139–140 (1944). See also *Trans World Airlines, Inc.* v. *Hardison* 432 U. S. 63, 76, n. 11. (1977).

the employee is not at work; such an exclusion has no direct effect upon either employ.1ent opportunities or job status." *Nashville Gas Co.* v. *Satty,* 434 U. S. 136, 145 (1977).

But unpaid leave is not a reasonable accommodation when paid leave is provided for all purposes *except* religious ones. A provision for paid leave "that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free . . . not to provide the benefit at all." *Hishon* v. *King & Spalding,* 467 U. S. 69, 75 (1984). Such an arrangement would display a discrimination against religious practices that is the antithesis of reasonableness. Whether the policy here violates this teaching turns on factual inquiry into past and present administration of the personal business leave provisions of the collective-bargaining agreement. The school board contends that the necessary personal business category in the agreement, like other leave provisions, defines a limited purpose leave. Philbrook, on the other hand, asserts that the necessary personal leave category is not so limited, operating as an open-ended leave provision that may be used for a wide range of secular purposes in addition to those specifically provided for in the contract, but not for similar religious purposes. We do not think that the record is sufficiently clear on this point for us to make the necessary factual findings, and we therefore affirm the judgment of the Court of Appeals remanding the case to the District Court. The latter court on remand should make the necessary findings as to past and existing practice in the administration of the collective-bargaining agreements.

*It is so ordered.*

JUSTICE MARSHALL, concurring in part and dissenting in part.

I agree with the Court's conclusion that, if the school board provides paid leave "for all purposes *except* religious ones," *ante* this page, its accommodation of Philbrook's religious needs would be unreasonable and thus violate Title VII.

But I do not find the specificity of the personal business leave, or the possibility that it may be used for activities similar to the religious activities Philbrook seeks leave to pursue, necessarily dispositive of whether the Board has satisfied its affirmative duty under § 701(j), 42 U. S. C. § 2000e(j), to reasonably accommodate Philbrook's religious needs. Even if the District Court should find that the personal leave is restricted to specific secular uses having no similarity with Philbrook's religious activities, Philbrook would still encounter a conflict between his religious needs and work requirements. In my view, the question would remain whether, without imposing an undue hardship on the conduct of its educational program, the school board could further reasonably accommodate Philbrook's need for additional religious leave.

If, for example, the personal business leave were so limited that it allowed teachers paid leave for the sole purpose of meeting with their accountants to prepare their income tax returns (a purely secular activity), a proposal from Philbrook that he be allowed to prepare his tax return on his own time and use this paid leave for religious observance might be found imminently reasonable and lacking in undue hardship. The Board's prior determination that the conduct of its educational program can withstand the paid absence of its teachers for up to six days each year for religious and personal reasons tends to indicate that granting Philbrook's similar request in this case for a total of six days paid religious leave and no personal leave is reasonable, would cause the Board no undue hardship, and hence falls within the scope of the Board's affirmative obligation under Title VII.

The Court suggests that requiring an employer to consider an employee's proposals would enable the employee to hold his employer hostage in exchange for a particular accommodation. *Ante*, at 69. If the employer has offered a reasonable accommodation that *fully* resolves the conflict between the employee's work and religious requirements, I agree that

no further consideration of the employee's proposals would normally be warranted. But if the accommodation offered by the employer does not completely resolve the employee's conflict, I would hold that the employer remains under an obligation to consider whatever *reasonable* proposals the employee may submit.

I do not accept the Court's conclusion that the statute, "[b]y its very terms," relieves the Board from this continuing duty to accommodate the special religious practices of its employees where doing so is reasonable and causes no undue hardship. *Ante*, at 68. The statute simply creates an affirmative duty to accommodate; it does not specify who must respond to whom. Nor am I persuaded that the legislative history cited by the Court disposes of this issue. The statement of Senator Randolph, who sponsored the amendment, that he hoped the "accommodation would be made with 'flexibility' and 'a desire to achieve an adjustment,'" lends at least as much support to the concept of the employer's continuing duty as it does to the Court's reading of the statute. *Ante*, at 69 (quoting 118 Cong. Rec. 706 (1972)).

The EEOC's guidelines on religious discrimination support an interpretation of the statute placing this continuing duty to accommodate on the employer.* Just last Term, in

---

*EEOC Guideline § 1605.2(c) states:

"(2) When there is more than one method of accommodation available which would not cause undue hardship, the Commission will determine whether the accommodation offered is reasonable by examining:

"(i) The alternatives for accommodation considered by the employer or labor organization; and

"(ii) The alternatives for accommodation, if any, actually offered to the individual requiring accommodation. Some alternatives for accommodating religious practices might disadvantage the individual with respect to his or her employment opportunities, such as compensation, terms, conditions, or privileges of employment. Therefore, when there is more than one means of accommodation which would not cause undue hardship, the employer or labor organization must offer the alternative which least disadvantages the individual with respect to his or her employment opportunities." 29 CFR § 1605.2(c) (1986).

*Meritor Savings Bank* v. *Vinson*, 477 U. S. 57, 65 (1986), we expressly relied on an EEOC guideline in holding that sexual harassment charges could provide the basis for a Title VII claim. The Court's reluctance to accord similar weight to the EEOC's interpretation here rests on nothing more than a selective reading of the express provisions of Title VII and the guidelines. *Ante,* at 69–70, n. 6. Title VII prohibits discrimination not only with respect to *employment opportunities,* § 703(a)(2), 42 U. S. C. § 2000e–2(a)(2), but also with respect to *"compensation,* terms, conditions, or privileges of employment." § 703(a)(1), 42 U. S. C. § 2000e–2(a)(1) (emphasis added). The EEOC guidelines consider compensation encompassed within the concept of "employment opportunities." 29 CFR § 1605.2(c) (1986). A forced reduction in compensation based on an employee's religious beliefs can be as much a violation of Title VII as a refusal to hire or grant a promotion.

In this case, contrary to the Court's conclusion, *ante,* at 70–71, the school board's accommodation of Philbrook's religious needs by merely allowing unpaid leave does not eliminate the conflict. Rather, the offer forces Philbrook to choose between following his religious precepts with a partial forfeiture of salary and violating these precepts for work with full pay. It is precisely this loss of compensation that entitles Philbrook to further accommodation, if reasonably possible without undue hardship to the school board's educational program. It may be that unpaid leave will generally amount to *a* reasonable accommodation, but this does not mean that unpaid leave will always be *the* reasonable accommodation which *best* resolves the conflict between the needs of the employer and employee. In my view, then, an offer of unpaid leave does not end the inquiry: If an employee, in turn, offers another reasonable proposal that results in a more effective resolution without causing undue hardship, the employer should be required to implement it.

The Court's analysis in *Trans World Airlines, Inc.* v. *Hardison*, 432 U. S. 63 (1977), is difficult to reconcile with its holding today. In *Hardison*, the Court held that the employer's chosen work schedule was a reasonable accommodation but nonetheless went on to consider and reject each of the alternative suggested accommodations. The course followed in *Hardison* should have been adopted here as well. "Once it is determined that the duty to accommodate sometimes requires that an employee be exempted from an otherwise valid work requirement, the only remaining question is . . . : Did [the employer] prove that *it exhausted all reasonable accommodations*, and that the *only remaining alternatives would have caused undue hardship* on [the employer's] business?" *Id.*, at 91 (MARSHALL, J., dissenting) (emphasis added).

Accordingly, I would remand this case for factual findings on both the intended scope of the school board's leave provision *and* the reasonableness and expected hardship of Philbrook's proposals.

JUSTICE STEVENS, concurring in part and dissenting in part.

While I agree with the Court's rejection of the rationale of the Court of Appeals' opinion, I would simply reverse its judgment. Remanding for further proceedings in the District Court is both unnecessary and confusing. Whether respondent Philbrook's complaint is analyzed as an outright claim that he is entitled to six paid days of leave for religious observance or as an argument that petitioner's employment policies, while facially neutral, fail to accommodate his religious beliefs, the record before us plainly discloses that he cannot prevail.

I

The school board has a clear duty not to discriminate against Philbrook because of his religious faith. Section 703(a) of the Civil Rights Act of 1964 flatly prohibits an em-

ployer from discriminating against any individual by basing employment and workplace decisions on the employee's or prospective employee's religion. This stricture against disparate treatment based on religion is simultaneously extended and qualified by § 701, which defines religion for purposes of the Act. Congress defines religion to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." § 701(j). The statute therefore imposes a duty on the employer to make reasonable accommodations, short of undue hardship, for the religious practices of his employees. *Trans World Airlines, Inc.* v. *Hardison,* 432 U. S. 63, 74 (1977). The effect of § 703(a) is to impose a special duty upon the employer when—and only when—a conflict arises between an individual's religious observance or practice and the employer's policy.

The statute does not allow a plaintiff raising a claim under § 701(j) to charge immediately onto the field of undue hardship. Folded within § 701(j) are certain preliminary inquiries. First, the court must ask whether the employee's job obligations are in conflict with his religious obligations. "The accommodation issue by definition arises only when a neutral rule of general applicability conflicts with the religious practices of a particular employee." *Hardison, supra,* at 87 (MARSHALL, J., dissenting). Absent a conflict, it makes no sense to speak of a duty to accommodate; there is no competing claim on the employee for which the employer must make adjustments. If the duty does arise, the statute requires the employer to resolve the conflict if it can do so without undue hardship. As the Court correctly holds, the employer has no statutory duty to resolve the conflict in the way the employee requests as long as the solution that is adopted is reasonable. I find it equally clear that the em-

ployer has no statutory duty to do anything more than strictly necessary to resolve the conflict.

Because the existence and scope of the duty to accommodate depend solely on the nature of the conflict between the terms of the job and the requirements of the religion, it is essential to identify the alleged conflict as precisely as possible. In this case Philbrook's faith prevents him from working on certain schooldays. The school board does not require him to work on any of those days; on three of those days each year it pays him even though he does not work, and on the other days it declines to pay him for the time that he spends discharging his religious obligations. The existence of a conflict is thus not immediately apparent.

Philbrook argues, however, that the contractual arrangement occasions two conflicts between his religious requirements and his employer's job requirements. First, he argues that the employer's practice of excluding religious observance as a permissible use of the three days of paid annual leave for "necessary personal business" is directly in conflict with his religious practice, because he needs to take those days as days of religious obligation. Second, during his unpaid absence from work on days of religious obligation, he is unable to do work and must later—or earlier—perform this work without separate compensation. In essence, he argues that the employer's practice of requiring him to complete this work, which is an integral part of his job duties as a salaried employee, conflicts with his religious obligation to be absent on the days when he would otherwise have performed this work and been paid for it. An examination of these claims discloses that neither has merit.

## II

Philbrook has contended that the school board has discriminated on the basis of religion in the allocation of its paid annual leave, or more specifically, in the limitation it has placed on the use of three days of paid annual leave for neces-

sary personal business. Properly viewed, the conflict Philbrook alleges is one which is not cognizable under § 703 and therefore entitles him to no relief. He points to the conflict, by no means specific to the practice of religion, between the Board's leave policy and the needs of an employee who wishes to use the three days of necessary personal business leave for any purpose not allowed by the contract. The Board allows all of its teachers three days of paid annual leave for "necessary personal business" but prohibits them from using any of those days for "[a]ny religious activity." On its face, this prohibition might appear to discriminate against employees who need to take a day off to attend church in favor of those who need a day off for secular reasons. The argument fails, however, because it does not fully describe either the scope of the separate provision for paid leave for religious purposes or the restricted scope of the provision for leave for necessary personal business.

The collective-bargaining agreement between the school board and the teachers' union contains generous provisions for paid leave for various specific purposes. After stating that 18 days of annual leave shall be granted "for personal illness and/or illness in the immediate family," the contract specifies 11 additional categories of personal leave, including 5 days for a death in the immediate family, 1 day each for attendance at funerals, weddings, graduations, and immediate family religious services, and 3 days each for "[m]andated religious observances" and "[n]ecessary personal business." The teacher is not required to identify the specific character of his personal business, but the contract limits the teacher's discretion by stating:

> "Necessary personal business shall not include (without limitations):
> "1. Marriage attendance or participation;
> "2. Day following marriage or wedding trip;
> "3. Attendance or participation in a sporting or recreational event;

"4. Any religious observance;

"5. Travel associated with any provision of annual leave;

"6. Purposes set forth under annual leave or another leave provision of this contract." App. 100.

Philbrook does not contend that the leave policy is discriminatory because he is eligible for, or has actually received, fewer days of paid leave than members of other religious faiths or than teachers who have no religious obligations on schooldays. The basis of his principal discrimination argument is that the total of six days for mandated religious observances and necessary personal business is not adequate to enable him to take care of "the personal business that is most important and pressing to him: religious activity and observance,"[1] whereas this combination of six days of paid leave is adequate for some teachers who have different religious and ethical commitments. Quite clearly, however, this argument rests on the premise that Philbrook's special, that is, religious, needs entitle him to extraordinary treatment. His "discrimination" argument states a grievance against equal treatment rather than a claim that he has been the recipient of unequal treatment.[2]

---

[1] "On the other hand, after Philbrook uses up his three days for religious leave, Ansonia's personal leave policy does not allow him to use the remaining three days of personal leave for the personal business that is most important and pressing to him: religious activity and observance. Unlike the Jewish teacher, Philbrook is a member of a faith that requires more than three days away from work for religious observance. *His* important and necessary personal business, involving fulfilling his need to gain understanding of the world around him, to serve the highest interests of his community, and to provide guidance and stability for his family, are all served by performing his religious obligation and attending his church. Solely because these needs are fulfilled for him through religious observance rather than secular activity, he is prohibited from using his personal leave to meet them." Brief for Respondent Philbrook 16.

[2] Denying the use of personal business days for religious purposes is no more discriminatory against religion than if the personal business leave category were entirely absent from the contract. Neither a decision to refuse personal business leave days altogether nor a decision to provide

This point comes into sharp focus when the contractual prohibition against using the three days of personal leave for "any religious observance" is seen for what it is, merely a part of the broader prohibition against using personal business leave for any of the purposes specifically authorized in the contract. The existing leave policy denies paid days to any teacher who proposes to take more paid days of personal business leave per year to fulfill his or her commitments than the contract allows. Philbrook's wish to use his secular leave for religious purposes is thwarted by the same policy that denies an avid official delegate to a national veterans' organization use of secular leave days for that activity in excess of the days specifically allotted for it under the contract. In fact, since three days are expressly authorized for mandated religious observances—events that recur each year—whereas most other categories of paid leave cover relatively infrequent contingencies such as a death in the family or attendance at a family wedding, it is highly probable that the leave policy as a whole tends to favor, rather than to disfavor, persons who must observe religious days during the school year. For example, an atheist who attends a wedding, a funeral, and a graduation on schooldays receives a total of three days of paid personal leave, but a religious person who attends the same three events on paid days also receives pay for three religious days.

## III

Philbrook's second claim is that the board has a duty of reasonable accommodation "to mitigate the burden of the Board's requirement that [he] work without pay in connection with his absence for religious observance." Brief for

---

these days for specific purposes not otherwise provided for in the contract represents a discrimination against religion.

Respondent Philbrook 24.[3]    This claim founders because
it discloses no conflict between Philbrook's religion and his
employment.    If he had been disciplined, or discharged, for
taking too many days off for religious services, the result
would be different, but the only inconvenience to which he is
subjected is the necessity of doing work on paid days that he
was unable to do during his days of religious observance.
This inconvenience arises not because of any discrimination
against religion, but because the employee's missed day of
work is unpaid.    Every employee who takes a day off from
work for an unauthorized purpose suffers the same inconve-
nience as Philbrook; each loses a day of pay and must make
up the work associated with that day.    The obligation to per-
form the work carries over, not because the employee has ex-
ercised his religion in the one case or satisfied a secular busi-
ness need in another, but for the generic and shared reason
that the employee was not paid for a day on which he was
hired to do work.    Since no statutory conflict between
Philbrook's religion and his work duties occurred, the duty to
accommodate his religious practices never arose.

## IV

The present state of the record enables me to conclude that
Philbrook states no claim of religious discrimination under
§ 703(a).    In remanding the case, the Court apparently over-
looks the plain fact that its rejection of the Court of Appeals'
view of the duty of reasonable accommodation eliminates the
necessity for further factual findings.    Under the Court of

---

[3] As he explains:
"His job has at least three parts: For every class he must first prepare the
lesson plan; then teach the class; and finally review his students' classwork.
On the days he is absent for religious holy days, he prepares the lesson
plans for his classes and reviews them with his substitute.    He then re-
ceives and corrects the assignments his students have completed in his ab-
sence.    [App. 68–70.]    Although his pay is docked, he is still required to
perform a substantial fraction of the duties for which his pay was intended
to compensate him."    *Id.*, at 24–25.

Appeals' theory that the employer has a duty to accept any reasonable accommodation proposal made by the employee as long as it does not result in "undue hardship," a remand to the District Court was appropriate to resolve the "undue hardship" issue. I do not understand why a remand is appropriate now. The Court of Appeals has already concluded that if no analysis of undue hardship is required, the Board's policy of granting three days of paid leave and additional days of unpaid leave for religious observances complies with the statute.[4] Neither that court nor the District Court saw any reason to make a special analysis of the "past and present administration of the personal business leave provisions of the collective-bargaining agreement." *Ante,* at 71.

In view of the record, the factual analysis the Court calls for may satisfy the demands of the Court's curious holding in *Icicle Seafoods, Inc.* v. *Worthington,* 475 U. S. 709, 714 (1986), but it cannot affect the outcome of this case. Whether the Board has administered the provisions for paid leave for secular purposes strictly or permissively has no bearing on Philbrook's legally insufficient complaint that he

---

[4] "The school board argues that we should find that its longstanding accommodation of three days of paid leave and additional days of unpaid leave for religious observance constitutes a reasonable accommodation and thus satisfies its duty to accommodate, citing the Tenth Circuit's decision in *Pinsker* v. *Joint District No. 28J,* 735 F. 2d 388, 391 (10th Cir. 1984). The *Pinsker* court held that a policy allowing two days of paid leave for religious reasons and additional days of unpaid leave satisfied the duty to accommodate. We presume that Ansonia's leave policy is 'reasonable.' *And if Title VII's duty to accommodate were to be defined without reference to undue hardship, we would hold that the school board has satisfied its burden.* The duty to accommodate, however, cannot be defined without reference to undue hardship. In many circumstances, more than one accommodation could be called 'reasonable.' Where the employer and the employee each propose a reasonable accommodation, Title VII requires the employer to accept the proposal the employee prefers unless that accommodation causes undue hardship on the employer's conduct of his business." 757 F. 2d 476, 484 (CA2 1985) (emphasis added).

has some but not enough leave for religious purposes.[5] The employer has no duty to provide Philbrook with additional days of paid leave. Nor can the uses for which the board has historically allowed personal leave days possibly create a duty to pay Philbrook to perform the work he missed on days of religious obligation.

Accordingly, I respectfully dissent from the part of the Court's judgment that remands the case for further proceedings.

---

[5] Though it is not necessary to my conclusion, the teachers' modest use of personal business days indicates that they are not treated as general leave days. In the 1982–1983 school year, for example, only 2 of the 131 teachers in the school system used all three days; 80 used none. Plaintiff's Exhibit 18.

In addition, the Board has strictly administered the use of necessary personal business days, limiting their use to the purposes not enumerated in the contract. The School Superintendent testified that the use of these three days' leave is closely monitored. Teachers may take one of these days in their discretion, without giving a reason for their absence, but must notify the principal or their superior of their absence 48 hours in advance. The Superintendent testified that he insures that teachers do not use that one discretionary day with pay for any of the reasons specifically enumerated in the contract:

"Q: If, in fact, you find that a teacher has utilized that one day for one of the reasons specifically listed in the contract for which days are separately allotted, what action, if any, would you take?

"A: If I found out, they would be deducted a day's salary for that one day." App. 65.

The other two days of necessary personal leave must be approved by the Superintendent with 48 hours' notice. The Superintendent reviews the request for leave, denying it if he does not consider it to be a necessary personal day. If the employee takes the day nonetheless, he or she is docked a day's pay. Id., at 54.