**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**J.C. PENNEY COMPANY, INC., Defendant.**

**Civ. A. No. EC 88–218–D–D.**

United States District Court, N.D. Mississippi, E.D.

March 20, 1990.

G. William Davenport, Senior Trial Atty., Birmingham District Office, E.E.O.C., Birmingham, Ala., for plaintiff.

Nicholas A. O'Kelly, Personnel Relations Atty., J.C. Penney Co., Inc., Dallas, Tex., Peyton S. Irby, Watkins, Ludlam & Stennis, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This cause came on for trial before this court, sitting without a jury, on January 16 and 17, 1990. The Equal Employment Opportunity Commission (EEOC) filed this cause on behalf of Dawn Doughty against her former employer, J.C. Penney Co., Inc., claiming that Penney's had constructively discharged her on the basis of her religion in violation of Title VII, 42 U.S.C. § 2000e–2(a)(1). That section prohibits discrimination on the basis of religion, and that statute elsewhere defines religion as follows:

The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

### Findings of Fact

Mrs. Dawn Doughty was a member of the Christian faith, of the Baptist denomination. It is her belief that she should not work on the Sabbath, which to members of her sect is Sunday. She claims to have formed this belief from her own reading of the scriptures of her faith, and admits that it is not a generally held tenet among other Baptists. She does work for her church as a pianist, both during the week and on Sundays, and receives the sum of $50.00 per week for her services, though she likes to think of this stipend as being in repay-ment of her 'expenses'. Mrs. Doughty does not view her activities as a pianist for the Sunday church services as "work". She also plays the piano in church for weddings and funerals, usually receiving remuneration therefor in the amount of $5.00 per hymn, and often received in addition thereto a "love offering," not arranged beforehand, which has ranged from $25.00 to $100.00. She admits to having played at a funeral on one occasion on a Sunday, but denies receiving any money therefor. She additionally admits to shopping on Sundays, but claims that shopping is not work and is therefore allowed. She admits that she would play the piano for weddings or funerals on Sundays, and, though she wouldn't charge her standard fee, she would accept a "love offering" if it were given "in appreciation and love."

Mrs. Doughty had been employed at J.C. Penney Company's Columbus, Mississippi store from August 25, 1979 to March 20, 1982, and from August 27, 1982 until she finally left their employ on July 21, 1986. On July 21, 1986, her job position was merchandiser's assistant, a position which entailed some duties in addition to the duties of a sales associate.[1] In May or June of 1986, in response to the repeal of the "Blue Laws" in Mississippi, Penney's decided to open the Columbus store on Sundays. At that time, the store manager, Ralph Blackstock[2], announced to the employees the possibility that the store would open. Despite conflicting testimony, it appears to the court that, after that meeting, the plaintiff approached Mr. Blackstock on the sales floor and informed the manager of her objections to working on Sundays; it appears that the conversation was short, and the matter was not pursued in detail. At a store meeting a week to ten days before the store opened, Blackstock announced the final decision to the employees and asked for volunteers to work the Sunday hours, offering premium pay for those hours.[3] Again Mrs. Doughty communicat-

---

1. The duties of this position are discussed in more detail below.

2. Mr. Blackstock is also a devout Southern Baptist, and is a deacon in his church.

3. Employees were offered time-and-one-half pay.

ed her concerns to Mr. Blackstock.[4] After receiving insufficient response to his request for volunteers [5], the manager decided that all employees would be required to work Sundays on a rotating basis; the number of employees was such that each employee would be scheduled to work every third Sunday. The first Sunday the store was scheduled to open was July 13, 1986. Mrs. Doughty was not scheduled to work that day. No other employees scheduled that day requested religious accommodations.

A merchandiser's assistant is responsible, in addition to the duties of a salesperson, for maintaining a current inventory, reordering merchandise [6], and taking care of unusual customer needs such as refunds, adjustments, and check approval. A merchandiser's assistant also exercises some limited managerial authority. At least two, and perhaps as many as three or four merchandiser's assistants were needed in the store on Sundays, though such employees were not generally called upon to exercise many of the responsibilities peculiar to that position.[7] It would have been possible, though from Penney's standpoint not particularly desirable on a permanent basis, for a sales associate to replace a merchandiser's assistant on the schedule; such arrangements had been made in the past when a merchandiser's assistant had taken sick leave. When the manager had tried to staff the store with volunteers, there had been several volunteers willing to work every Sunday in return for premium pay, including some Merchandiser's Assistants.

The second Sunday the store was scheduled to be open was July 20, 1986. The schedule for that week, upon which Mrs. Doughty was listed to work, was posted on a bulletin board in the store on the preceding Thursday. Mrs. Doughty saw the schedule and spoke to the floor supervisor, Marilyn Horton, whose duty it was to prepare the schedule, regarding her religious belief. The floor supervisor told her that she would have to speak with Mr. Blackstock.

Mrs. Doughty then met with the manager and told him that she could not work on Sundays, and offered instead to work every Saturday, a shift which was traditionally unpopular.[8] The manager, who knew that the plaintiff played the piano at church on Sundays, offered to allow her to come in late and/or leave early to allow her to continue playing the piano on Sundays. Mrs. Doughty then made clear to Mr. Blackstock that she felt it wrong to work at all on Sundays, and turned down the manager's offer of special Sunday hours. He called Marilyn Horton in and had her remove Mrs. Doughty's name from the schedule for that Sunday. He made clear at that time that, to avoid making the other employees discontented, he wished Mrs. Doughty to keep quiet about the change. About half-an-hour to an hour later, Ms. Horton reported four or five complaints from other employees to Mr. Blackstock. A few of the employees told Ms. Horton that Mrs. Doughty had been talking about the schedule change on the sales floor.[9]

**4.** And again, Mr. Blackstock had no recollection of such a meeting until Mrs. Doughty was scheduled to work on a Sunday. The court believes that Mrs. Doughty placed more importance on these brief meetings than did the Manager. It appears that Mr. Blackstock simply forgot them.
   Mr. Blackstock admits that he knew, at all times pertinent to this lawsuit, that Mrs. Doughty played the piano at church on Sundays, and at other times for weddings and funerals.

**5.** Several employees did volunteer to work every Sunday, including some merchandiser's assistants. Operation of the store, however, required the presence of more employees than volunteered.

**6.** It appears that the merchandiser's assistants actually recommended that the merchandiser reorder the particular goods for which the assistants found inventory to be low.

**7.** On Sundays, the merchandiser's assistants did not generally take inventory or reorder stock, though they could restock the shelves, if needed. Their customer-related and managerial duties remained unchanged.

**8.** Ken Woodruff, who was then the assistant store manager, was present for part of this meeting.

**9.** The court notes that such evidence was not admitted for the truth of the matter asserted therein, but for the limited purpose of establishing Mr. Blackstock's state of mind. Indeed, Mrs. Doughty testified without contradiction

Ms. Horton told Mr. Blackstock of this as well. Mr. Blackstock testified that one employee had come to him and told him the same thing. Mr. Blackstock had Ms. Horton return Mrs. Doughty's name to the schedule. Mrs. Doughty saw the change, but made no further contact with the manager prior to her shift on July 20.

Mrs. Doughty did not come to work on July 20, 1986, nor did she make arrangements for anyone else to take her place. When she arrived at work for her regular shift on the following Monday, she was informed that Mr. Blackstock wanted to see her in his office. Blackstock asked her whether she realized that she had been scheduled to work the previous day, to which she responded that she did realize it. The manager sent her back to work, telling her that he'd call her back in shortly. He then called Nelle Funderburk, J.C. Penney's regional personnel attorney, at Penney's Atlanta, Georgia office. Attorney Funderburk told Mr. Blackstock to give Mrs. Doughty a corrective interview, offer her "on-call" status—which she said could be done without loss of benefits—and proceed from there. She also stressed that he was not to fire Mrs. Doughty, and was to accommodate her if possible. She asked finally that Blackstock fully document the meeting.

The manager called Mrs. Doughty back into his office. The conduct of both parties at this meeting is subject to divergent testimony by Mrs. Doughty and Mr. Blackstock.[10] The testimony is not, however, so divergent that common ground cannot be discerned. The court, having heard the testimony of each witness, is convinced that each witness told the truth as they saw it,[11] and that the truth lies somewhere between the two versions. The court makes certain allowances for each witness' recollection: Mr. Blackstock apparently was subject to occasional lapses of memory, and Mrs. Doughty—who wept during her direct testimony regarding the interview—was highly emotional or even hysterical during the interview. Given these considerations, the court reconstructs the interview as follows[12]:

Mrs. Doughty met with Mr. Blackstock in his office; Mr. Woodruff, the assistant manager, was also present. The meeting, according to Mrs. Doughty, took at most five to ten minutes. The manager and assistant manager apparently questioned Mrs. Doughty briefly about the details and sincerity of her belief in not working on Sunday. They asked what the difference

that she had not spoken about it to other employees, though she did admit that she had heard at least one other employee complaining about the change. Indeed, she testified that she never saw the schedule between the time she was taken off and the time she was returned to the Sunday schedule, and that she never knew that she had actually been removed. As the schedule was posted where all employees were expected to see it, this testimony is not entirely incredible; the court, however, does not believe that this question needs to be definitively decided for a resolution of this case.

10. Mr. Woodruff was also present at the meeting, and his notes of the meeting were introduced at trial. Mr. Woodruff was not called as a witness at trial, nor did either party seek to introduce his deposition. Indeed, it appears that neither side so much as attempted to depose him. The court does not draw any conclusions adverse to either party from these omissions. The plaintiff argues that the court is bound to hold this omission heavily against the defendant; it appears to the court that the authorities cited by the plaintiff leave that to the discretion of the finder of fact.

11. Indeed, though the manager was called as a witness by the plaintiff, his testimony was so even-handed that his status as an adverse witness often seemed little more than a formality.

12. There has been considerable disagreement over precisely what was said, and how it was said. The court does not expressly rule on each of these disputes, as they are individually of little relevance. Their primary importance is as they impact on the issue of the tone of the meeting. For example, Mrs. Doughty spoke at length about an alleged incident which Mr. Blackstock categorically denies ever occurred: Blackstock allegedly stopped Doughty from going to her locker to get her Bible, saying "I know the scripture as well as you do." Even were this proven to have occurred, the court sees no independent relevance in this incident.

The court does reach a general conclusion as to the tenor of the meeting: the parties were tense and Mrs. Doughty was emotionally on edge.

was in her mind between working as a church pianist and working at any other job on Sunday. The manager then gave Mrs. Doughty a document to read and sign, to the effect that she had once knowingly failed to work when scheduled, that she would again be scheduled to work on Sunday in three weeks time, and that if she failed to work that day, she would be placed on a "call when needed" schedule. Mr. Blackstock gave her a very sketchy explanation of what "call when needed" meant. He informed her that "on call" associates worked a variable schedule when the store needed their services. He did not, as plaintiff contends, tell her that she would work "maybe the two busy days after Thanksgiving." Nor did he explain to her that she would be able to keep a full-time number of hours, or that Penney's would try to see to it that she would have enough hours to retain her eligibility for benefits.

Mrs. Doughty told them that she had to call her husband. Blackstock and Woodruff objected, but she insisted. They left her in Blackstock's office to use the phone, and when they returned they found her resignation on the desk.[13] She left the store immediately, without again seeing Blackstock or Woodruff.

The court believes that the store management meant the offer of on call status as a good faith effort at accommodation, but that Mrs. Doughty misunderstood the offer as a constructive discharge.

Both she and the store management share the responsibility for the misunderstanding. Management did not explain the plan in enough detail to make Mrs. Doughty understand that she could still work a nearly full-time schedule and could thus retain her benefits.[14]

The hourly wage paid by J.C. Penney's is low; the primary incentive for employees is the company's benefit plan, available to "regular" associates. Status as a "regular" employee is based upon hours worked on an ongoing basis, as it is used in this context. On call associates may be "regular" employees.[15] To attain "regular" status, an employee must work 260 hours in any consecutive thirteen weeks. Plaintiff was already a regular employee. To maintain eligibility, the employee must work 200 hours in each subsequent "rolling" thirteen week period. An employee must therefore work an average of 15.4 hours every week to maintain eligibility. "Rolling" means that each week's hours are added to the total hours worked in the preceding twelve weeks, and thus a new total is generated every week. This system was computerized at about the time plaintiff left J.C. Penney's, and as part of that program, management was alerted if an employee's total for the prior thirteen weeks was less than 200 hours. The employee would then, if possible, be given enough hours in the next week to bring his/her total hours above 200, so as not to lose benefit eligibility.

13. Mrs. Doughty's version of this scene involves using another phone in the management area, then borrowing a piece of paper, writing out her resignation and leaving her resignation on the manager's desk. She left the store immediately. The court sees little relevant difference between the two versions.

14. Mrs. Doughty worked for J.C. Penney's for seven years, and during that time often worked with on call associates in her own department. For part of that time, she was a merchandiser's assistant, and thus had limited supervisory duties with regard to such employees. Nonetheless, plaintiff claims, she had never heard of on call associates and knew nothing of their status within the company. This is difficult to credit. The court finds, however, that she did not know the details of the position necessary to make an informed decision.

15. The EEOC argued at length concerning language in the policy brochures and other documents which, they claimed, meant that on-call associates could not be "regular" associates for benefit eligibility purposes. The court construes the policy documents and holds that, by the terms of the policy, on call associates can be "regular" associates. The term "regular" apparently has two different meanings when used in different contexts.

The court finds that neither Mrs. Doughty nor her husband studied these documents in the short time it took them to decide that Mrs. Doughty would resign. Therefore, the documents' ambiguity, if any, has no relevance to the instant case.

Many on call employees at the J.C. Penney Columbus store do not work sufficient hours to attain or maintain benefit eligibility; that is due, at least in part, to the preference of those employees. Many on call employees are people whose schedules do not allow them to work the sort of hours necessary on a regular basis. They include students and people with other full-time jobs. It appears that "regular on call" employees have generally retained eligibility once it has been earned. Indeed, at least one on call associate maintained a schedule with weekly hours in excess of those of "full-time" associates. Plaintiff, had she accepted the on call option, would have been the most experienced on call associate at the Columbus location, and presumably would have been in greatest demand to fill on call shifts, particularly to replace other merchandiser's assistants.

The manager testified, and the court believes, that he would have been amenable to other proposals from the plaintiff, had she not immediately quit. The plaintiff was not scheduled to work again on Sunday for three weeks, and thus her decision could have been put off at least until closer to that time. Mrs. Doughty could have explored the possibility of accepting "on call" status, or perhaps another arrangement could have been reached.[16] Plaintiff did not even express her rejection of on call status to the store management prior to submitting her resignation and leaving the store. She left no room for compromise.

## CONCLUSIONS OF LAW

Most courts hold that a plaintiff may establish a *prima facie* case of religious discrimination by showing (1) that he/she has a *bona fide* religious belief that conflicts with an employment requirement; (2) that he/she informed the employer of this belief; and (3) that he/she suffered an adverse employment action for failing to comply with the conflicting employment requirement. *See Philbrook v. Ansonia Board of Education*, 757 F.2d 476 (2d Cir. 1985) *rev'd on other grounds*, 479 U.S. 60,

107 S.Ct. 367, 93 L.Ed.2d 305 (1986). If the plaintiff establishes a *prima facie* case, the burden then shifts to the employer to show that it cannot reasonably accommodate plaintiff without undue hardship on its business. *Id.*

In the instant case, plaintiff has met its burden as to the first two elements of a *prima facie* case. The court is convinced that Mrs. Doughty honestly believes that the scriptures of her faith require that she abstain from work on Sunday, except as a church pianist. Her beliefs need not be internally consistent. Inconsistencies are merely evidence to be weighed in determining whether her belief is sincere. Nor is it necessary that others of her faith hold the same view. Further, it is undisputed that, at some time prior to Sunday, July 20, 1986, Mrs. Doughty informed the management of the Columbus J.C. Penney's store of her belief in not working on Sundays.

The third requirement is that plaintiff prove that Mrs. Doughty suffered an adverse employment action. The plaintiff argues that Mrs. Doughty was constructively discharged. Plaintiff cites the case of *Young v. Southwestern Savings & Loan Assoc.*, 509 F.2d 140 (5th Cir.1975), a Title VII case claiming religious discrimination by constructive discharge.

> [T]he general rule is that if an employer deliberately makes the employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct as if it had formally discharged the aggrieved employee.

*Id.*, at 144. In *Young*, the plaintiff, an atheist, resigned her position rather than attend staff meetings which always began with a prayer and a religious talk by a local Baptist minister. Her supervisor, noting her absence from one such meeting, informed her that attendance at such meetings in their entirety was mandatory, and that she could close her ears during the religious parts. He 'left the decision up to

---

**16.** The EEOC raised the possibility of taking volunteers, such as those who had originally volunteered to work every Sunday, to work Mrs. Doughty's Sunday shifts.

**198**

her' as to her attendance at the next meeting, to be held a month from that day. Even though plaintiff did not have to decide for a month, she quit immediately. The court therein held that she was constructively discharged.

Mrs. Doughty's situation is surprisingly similar to that of Ms. Young. The cases are distinguishable in one dispositive particular, however; in *Young*, the employer had delivered an ultimatum and had given no indication of flexibility. The court held that the plaintiff had reasonably understood the supervisor's reference to attendance as "mandatory" as meaning that she must attend or she would be fired. Further, plaintiff was not required to stay for the rest of the month in hopes that something could be worked out where there was no indication that compromise was possible. In the instant case, the defendant was attempting to reach an accommodation with Mrs. Doughty at the time she resigned. There was every indication that compromise was possible, even if Mrs. Doughty did not accept the offer of on call status. Defendant had taken her off the Sunday schedule, though due to complaints received from the staff Blackstock returned her to the schedule. The defendant offered to allow her to come in late and leave early; even though that option cannot be considered an accommodation, it serves to indicate to a reasonable person that the defendant was looking for a compromise that each party could live with. Finally, defendant offered Mrs. Doughty on call status; Mrs. Doughty misunderstood this offer, rejected it and immediately quit. Given the attempts by the defendant to reach a compromise, even though Mrs. Doughty found their offers unacceptable as she understood them, this court cannot find that any *deliberate* act of the defendant's made her working conditions so intolerable that plaintiff should have reasonably felt herself forced to quit. *See also Ansonia Board of Education v. Philbrook*, 479 U.S. 60, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986); *Jenkins v. State of Louisiana, Thru Department of Corrections*, 874 F.2d 992 (5th Cir.1989). Further, Mrs. Doughty was not forced to quit as the defendant had made what the court now finds to have been a reasonable, though admittedly not a perfect, offer of accommodation. *Philbrook, supra.* The fact that the defendant did not fully explain the details of the offer to her is offset by her failure to give the defendant a reasonable opportunity to explain. *Cf. Young, supra.*

The court thus holds that the plaintiff has failed to carry its burden of proof as to its claims of constructive discharge and thus that Mrs. Doughty suffered an adverse employment action at the hands of the defendant. An order in conformity herewith shall issue.