**Wilbur TOLEDO,**
**Plaintiff–Appellant/Cross–Appellee,**

v.

**NOBEL–SYSCO, INC.,**
**Defendant–Appellee/Cross–Appellant.**

Nos. 86–1853, 86–1871.

United States Court of Appeals,
Tenth Circuit.

Dec. 29, 1989.

---

Stephen T. LeCuyer of Mettler & LeCuyer, Shiprock, N.M., for plaintiff-appellant/cross-appellee.

Peter J. Adang (Jeffrey Twersky and Eleanor K. Bratton, with him on the brief) of Modrall, Sperling, Roehl, Harris & Sisk, P.A., Albuquerque, N.M., for defendant-appellee/cross-appellant.

Before LOGAN and SEYMOUR, Circuit Judges, and ANDERSON,* District Judge.

SEYMOUR, Circuit Judge.

Wilbur Toledo brought suit under 42 U.S.C. § 1981 (1982) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* (1982), charging that Nobel–Sysco, Inc. discriminated on the basis of religion, race, and national origin when it refused to hire him as a truck driver due to his religious use of peyote. The district court dismissed Toledo's race and national origin claims on Nobel's motion for summary judgment and, after a bench trial, also dismissed his religious discrimination claim. The court held that although Nobel's failure to hire Toledo was religious discrimination, offers Nobel made during subsequent administrative proceedings constituted reasonable accommodation of Toledo's religious practices and thus cured the discriminatory act. *See Toledo v. Nobel–Sysco, Inc.*, 651 F.Supp. 483 (D.N.M.1986). We reverse as to the religious discrimination claim because settlement offers made dur-

---

* The Honorable Aldon J. Anderson, Senior United States District Judge, District of Utah, sitting by designation.

ing administrative proceedings do not qualify as "reasonable accommodation" under the religious discrimination provision of Title VII. We affirm the summary dismissal of Toledo's race and national origin discrimination claims.

# I.

## FACTS

### A. Toledo's Employment Application

In March 1984, Toledo applied for a position as a truck driver for Nobel–Sysco, Inc.. Nobel is a restaurant supply corporation that distributes food, equipment, and other supplies to customers in Wyoming, Colorado, Arizona, and New Mexico. Toledo applied for a job as a delivery driver domiciled in Farmington, New Mexico, where he lived. Had Toledo been hired, he would have made deliveries to customers in northern New Mexico and southern Colorado, a responsibility which included considerable driving over mountain roads. He also would have been required to work Monday through Saturday, and to be available for occasional Sunday deliveries. He would have worked without day-to-day supervision from Nobel, whose nearest office is in Albuquerque.

Nobel responded to Toledo's application by inviting him to interview at its Albuquerque office. Nobel's office manager, Rodney Plagmann, conducted the interview. After the interview, Plagmann told Toledo he had the necessary experience for the job and would be hired if he passed four tests routinely given to all of Nobel's driver applicants. One of these tests was a polygraph to determine an applicant's truthfulness in responding to questions about past illegal drug use. It was a Nobel policy not to hire applicants who had used illegal drugs in the two years preceding their job application. This policy was stated in both the newspaper advertisement to which Toledo had responded and in information sent to Toledo before his interview. After being told of the polygraph requirement, Toledo informed Plagmann that he was a member of the Native American Church, and had used peyote as part of

church ceremonies. Toledo described the purpose of the ceremonies, and indicated he had used peyote twice in the previous six months.

Plagmann did not attempt at that time to obtain more specific information regarding Toledo's use of peyote, but he did say that Nobel probably could not hire Toledo. After the interview Plagmann sought advice from James Etherton, Nobel's director of personnel. Etherton in turn called Nobel's labor relations advisor, Jack Moore of Mountain States Employers Council, and related the details of Toledo's interview. Moore told Etherton that although religious use of peyote was legal, hiring a known user would expose Nobel to potential liability if he were ever involved in an accident while driving for Nobel. Etherton then told Plagmann not to hire Toledo, and Plagmann in turn informed Toledo that Nobel could not hire him because of his use of peyote. Neither Etherton nor Plagmann discussed or attempted accommodation of Toledo's religious practices at that time.

### B. The Native American Church and Use of Peyote

Toledo has been a member of the Native American Church since 1983. The role of peyote in church ceremonies was well documented at trial, and has been the subject of considerable attention in judicial opinions. See, e.g., Peyote Way Church of God, Inc. v. Smith, 742 F.2d 193 (5th Cir. 1984); Native American Church of New York v. United States, 468 F.Supp. 1247 (S.D.N.Y.1979), aff'd, 633 F.2d 205 (2d Cir. 1980); Smith v. Employment Div., 307 Or. 68, 763 P.2d 146 (1988), cert. granted, —— U.S. ——, 109 S.Ct. 1526, 103 L.Ed.2d 832 (1989); People v. Woody, 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964). Our discussion of church ceremonies reflects Toledo's description at trial of ceremonies in which he took part, and the trial court's findings based on those descriptions.

Peyote is a small spineless cactus that contains quantities of the hallucinogen mescaline. Native American religious use of peyote was first noticed by Spanish explorers in the 1600's, and efforts to prohibit

it date from the same century. Peyote use is the central and most sacred practice of the Native American Church. Its believers consider peyote to be not only a healer, a teacher, and a way of communicating with God, but also a deity itself. The Native American Church is an incorporated religion which combines elements of Christianity with traditional Native American beliefs and the use of peyote.

Peyote ceremonies are held at the request of any member for healing purposes or special occasions. Although the ceremonies may be conducted on any night of the week, they are generally held on Friday or Saturday night. The ceremonies that Toledo attends are conducted by a "Road Man," and take place in a hogan or tepee. A ceremony begins in the late evening, and passes through a series of rituals and prayers, culminating in the ingestion of peyote around midnight. The peyote is prepared by floating "buttons," or small slices, of the cactus in water. It is served in cups which are passed among the participants who both drink the water and chew and swallow the pieces of peyote. Toledo testified that the cups are always passed once, and often twice. He usually only drinks on the first pass, but occasionally drinks on the second. The ceremony continues until dawn. Toledo stays awake until four or five in the afternoon after a ceremony, and then sleeps until the next morning.

Toledo testified that he normally feels the effects of peyote only for approximately four hours after ingesting it. Experts testified for both sides, and presented considerable scientific descriptions of the effects of peyote. The trial court concluded that the doses Toledo takes at the ceremony are from 1.6 to 6.4 milligrams per kilogram of body weight. Both experts agreed that a person should not drive a truck for 24 hours after ingesting more than 1 milligram per kilogram of body weight.

## C. Procedural History

Shortly after he was refused the Nobel job, Toledo filed an employment discrimination claim with the New Mexico Human Rights Commission (HRC) charging Nobel

with religious discrimination. He subsequently amended his HRC complaint to charge discrimination based on race and national origin as well. In May 1984, Nobel made Toledo the first of the two offers that are the focus of this dispute on appeal. Nobel indicated it would hire Toledo on three conditions: 1) that he take the polygraph test and it show no illegal drug use other than peyote twice a year; 2) that he take a week of regular vacation after each ceremony; and 3) that he drop his HRC complaint if Nobel hired him *or* if he failed the polygraph test or physical examination. Toledo rejected the offer and did not make a counter-offer.

On May 24, HRC found probable cause that religious discrimination had occurred. The parties continued their negotiations, and on July 10 Nobel improved its initial offer. Nobel indicated that if Toledo would give one week's notice before taking part in a ceremony, he would be required to take only one day off after each ceremony. Nobel also offered $500 in back pay, but still required the polygraph test, the physical examination, a limit of two ceremonies a year, and that Toledo drop his claim. Toledo rejected the offer because the back pay amount was insufficient and because he felt the restrictions on his peyote use were unjustified. He also thought that Nobel would use the polygraph test and physical examination as an excuse to disqualify him, thereby getting rid of both him and his discrimination claim. Toledo did not make a counter-offer.

In January 1985, the EEOC issued Toledo a right to sue notice. Toledo filed this suit, charging religious discrimination in violation of Title VII, and race and national origin discrimination in violation of Title VII and 42 U.S.C. § 1981. The district court granted Nobel summary judgment on Toledo's race and national origin claims. After a bench trial, the court also held for Nobel on the issue of religious discrimination. The court determined that although Toledo had made out a prima facie case of religious discrimination, the July 10 offer made in the course of the HRC proceedings constituted reasonable accommodation of Toledo's religious practices. The court also

refused to award Toledo back pay for the four months between the discriminatory act and the accommodation offer because Toledo had not proven the appropriate amount at trial. Finally, the court awarded Nobel costs.

Toledo appeals the court's holding that the settlement offers absolved Nobel of liability and ended its backpay obligations, the award of costs, and the dismissal of his race and national origin claims. Nobel cross-appeals the court's holding that Nobel could have accommodated Toledo without undue hardship.

## II.

## LIABILITY

Title VII makes it "an unlawful employment practice for an employer ... to fail or refuse to hire or to discharge any individual ... because of such individual's ... religion." 42 U.S.C. § 2000e–2. Religion is defined by the Act as follows:

"The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business."

42 U.S.C. § 2000e(j) (1982). As the Supreme Court has noted, "[t]he reasonable accommodation duty was incorporated into the statute, somewhat awkwardly, in the definition of religion." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 63 n. 1, 107 S.Ct. 367, 369 n. 1, 93 L.Ed.2d 305 (1986).

"The Supreme Court has held that the intent and effect of this definition of 'religion' is to make it a violation of § 2000e–2(a)(1) for an employer not to make reasonable accommodations, short of undue hardship, for the religious practice of employees and prospective employees."

*Pinsker v. Joint Dist. No. 28J*, 735 F.2d 388, 390 (10th Cir.1984) (citing *Trans World Airlines v. Hardison*, 432 U.S. 63,

74, 97 S.Ct. 2264, 2271, 53 L.Ed.2d 113 (1977)).

Although the Supreme Court has never ruled on the issue, lower courts have implemented a two-step procedure for evaluating claims and allocating burdens of proof under these provisions. First, the plaintiff has the burden of establishing a prima facie case.

"A plaintiff ... makes out a prima facie case of religious discrimination by proving: (1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was [not hired] for failure to comply with the conflicting employment requirement."

*Turpen v. Missouri–Kansas–Texas R.R.*, 736 F.2d 1022, 1026 (5th Cir.1984); *see also Smith v. Pyro Mining Co.*, 827 F.2d 1081, 1085 (6th Cir.1987), *cert. denied*, 485 U.S. 989, 108 S.Ct. 1293, 99 L.Ed.2d 503 (1988); *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 133 (3d Cir.), *cert. denied*, 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986); *Proctor v. Consolidated Freightways Corp.*, 795 F.2d 1472, 1475 (9th Cir. 1986). Once a plaintiff has made out a prima facie case, "the burden shifts to the employer to show that it was unable reasonably to accommodate the plaintiff's religious needs without undue hardship." *Turpen*, 736 F.2d at 1026; *see also Pyro Mining*, 827 F.2d at 1085; *Protos*, 797 F.2d at 134; *Proctor*, 795 F.2d at 1475.

The district court in this case found that Toledo met his burden of establishing a prima facie case, and Nobel does not contest this finding on appeal. It was undisputed at trial that the Native American Church is a bona fide religion, Toledo is a member of the Church, Toledo's beliefs in its teachings are sincere, Toledo uses peyote only as part of church ceremonies, and Nobel refused to hire Toledo because of his peyote use. *See Toledo*, 651 F.Supp. at 488.

The dispute at trial and in this appeal centers on the district court's findings with respect to reasonable accommodation and undue hardship. The court held that Nobel

could rebut the prima facie case by showing either actual efforts at reasonable accommodation or that it could not accommodate Toledo's practices without undue hardship. The court rejected Nobel's argument that it could not have accommodated Toledo's peyote use without undue hardship, but held that the July 10 offer constituted an attempt at reasonable accommodation.

Nobel argues on appeal that the district court erred in holding that it could have accommodated Toledo's religious practices without undue hardship, but was correct in finding that the July 10 offer was an effort at reasonable accommodation. Nobel also argues that by adopting an intractable bargaining position, Toledo breached his duty to cooperate with Nobel's accommodation efforts. Toledo argues that the July offer was a settlement offer, and not an accommodation offer. He also claims that although the court was correct in holding that Nobel could have accommodated his practices without undue hardship, the court should not have reached this issue because Nobel failed to prove any effort at accommodation.

We address in turn whether either settlement offer qualifies as a reasonable accommodation under 42 U.S.C. § 2000e(j), whether Toledo breached any duty to cooperate by refusing these offers, and, finally, whether the district court was correct in addressing the issue of undue hardship and finding in Toledo's favor.

### A. Accommodation

Whether a settlement offer made in the context of an administrative proceeding on a claim of religious discrimination qualifies as reasonable accommodation under section 2000e(j) appears to be a question of first impression. Rather than relying on precedent, therefore, the parties focus their arguments on the policies behind this provision of Title VII. Nobel correctly points out that Title VII strongly encourages cooperative settlements as the primary means for resolving claims of discrimination. Nobel argues that including settlement offers made in the course of administrative proceedings as efforts at reasonable accommodation will encourage the making of such offers, thus furthering the important statutory policy favoring voluntary reconciliation.[1] Toledo contends in response that this approach would encourage employers to adopt a wait-and-see attitude towards employees with problematic religious practices. He suggests that when an employee or applicant presents an employer with a religious practice that conflicts with an employment requirement, under Nobel's approach the employer would have every incentive to discriminate against the employee, knowing that if the employee files a complaint it can absolve itself of liability by attempting accommodation at that time.

We believe that Toledo's position represents the better view. It finds initial support in the language and structure of the statute, which makes illegal any adverse employment action grounded in discrimination on the basis of religion. 42 U.S.C. § 2000e–2. Religion is defined as any practice, belief, or observance which an employer can reasonably accommodate without undue hardship. 42 U.S.C. § 2000e(j). These provisions of the statute together imply that acting to the detriment of an applicant or employee because of his religion *before* attempting accommodation is illegal. This reading comports with the Supreme Court's conclusion that the effect of the accommodation requirement "was to make it an unlawful employment practice ... for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees."

---

1. The parties do not address the impact of 42 U.S.C. § 2000e–5(b) on this issue. That provision states in pertinent part that nothing said or done in the course of administrative proceedings may be "used as evidence in a subsequent proceeding without the written consent of the parties concerned." Courts discussing this non-disclosure provision have concluded that it promotes voluntary conciliation, undercutting Nobel's argument that the disclosure of such offers in litigation furthers voluntary settlement. *See, e.g., Olitsky v. Spencer Gifts, Inc.,* 842 F.2d 123, 127 (5th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 307, 102 L.Ed.2d 326 (1988).

*Trans World Airways,* 432 U.S. at 74, 97 S.Ct. at 2271.

When Nobel rejected Toledo based solely on his religious practices without an attempt to accommodate him, assuming it could have done so without undue hardship, it committed an illegal act. The settlement offer made in response to the administrative charge could not undo the completed act.[2] Indeed, the effect in the Title VII context of offers of employment is well defined and narrow. The Supreme Court has held that after an employee brings a Title VII claim, an offer of employment may toll backpay liability if the offer is not conditioned on dropping the discrimination charges. *See Ford Motor Co. v. EEOC,* 458 U.S. 219, 232–34 & n. 18, 102 S.Ct. 3057, 3065–66 & n. 18, 73 L.Ed.2d 721 (1982). Nobel's offer to Toledo was conditioned on Toledo dropping the charges, as well as his passing a number of tests. We see no reason to give this offer the new power of "curing the discriminatory act," when under *Ford* it would not even toll Nobel's liability for backpay.[3]

In addition, Toledo's policy arguments are more persuasive. Under the rule advocated by Nobel, an employer could absolve itself from liability for religious discrimination after it had disadvantaged an employee. When conflicts with religious practices first arise, an employer's conduct and the manner in which it deals with such conflicts would be virtually unregulated. Title VII would provide employees no protection until after the fact, an important consideration given the impact a suspension, termination, or rejection may have on an individual's life. We conclude that the trial court erred in considering Nobel's settlement offers as reasonable accommodation which cured Nobel's illegal discriminatory act.

### B. Toledo's Duty to Cooperate

■ Nobel correctly points out that an employee or applicant has a duty to cooperate with an employer's efforts to accommodate his religious practices. The Supreme Court has recently endorsed this idea:

"To the extent it provides any indication of congressional intent, ... we think that the [legislative] history [of section 2000e(j)] supports our conclusion. Senator Randolph, the sponsor of the amendment that became [section 2000e(j)], expressed his hope that accommodation would be made with 'flexibility' and 'a desire to achieve an adjustment.' 118 Cong.Rec. 706 (1972). Consistent with these goals, courts have noted that 'bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business.' "

*Ansonia Bd. of Educ.,* 479 U.S. at 69, 107 S.Ct. at 372 (quoting *Brener v. Diagnostic Center Hospital,* 671 F.2d 141, 145–46 (5th Cir.1982)). Nobel argues that Toledo breached this duty by rejecting its offers and, without offering a counter-proposal, taking the position that the proposed limitations on his religious practices were unacceptable. This breach, the argument continues, should absolve Nobel from any liability under Title VII.

■ We disagree. In *Ansonia Bd. of Educ.* the employee's duty to cooperate was triggered by the employer's initial efforts at accommodation. Here, to the contrary, Nobel did not attempt to accommodate Toledo's beliefs before it refused to hire him. "[T]he statutory burden to accommodate rests with the employer," *Brener v. Diagnostic Center Hospital,* 671

---

**2.** This approach accords with that taken by the court in *Boomsma v. Greyhound Food Management, Inc.,* 639 F.Supp. 1448 (W.D.Mich.1986), *appeal dismissed,* 815 F.2d 76 (6th Cir.1987). The employer there suspended an employee for his religiously-motivated refusal to work on Sundays, and only then considered shift-trading arrangements that might accommodate the employee's religious practices. The court refused to consider these efforts because the "defendant failed to engage in efforts to accommodate rea-

sonably plaintiff's religious belief against working on Sundays until after plaintiff had suffered adversely for adhering to such belief." *Id.* at 1454.

**3.** Toledo argues that because the offers constituted settlement offers, they should have been inadmissible under Federal Rule of Evidence 408. Given our reversal on other grounds, we need not address this issue.

F.2d 141, 146 (5th Cir.1982), and the employee's "duty to make a good faith attempt to satisfy his needs through means offered by the employer," is irrelevant until the employer satisfies its initial obligation under the statute. *Id.; see also Anderson v. General Dynamics Convair Aerospace Div.*, 589 F.2d 397, 401 (9th Cir. 1978) ("The burden was upon the [employer], not [the employee], to undertake initial steps toward accommodation. [The employer] cannot excuse [its] failure to accommodate by pointing to deficiencies ... in [the employee's] suggested accommodation."), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). Because the accommodation offer came after the initial unlawful refusal to hire, we conclude that Toledo did not breach his duty to cooperate with Nobel in reaching a reasonable accommodation.

### C. Undue Hardship

■ The court below held that Nobel could accommodate Toledo's religious use of peyote without undue hardship. Toledo argues that any claim of undue hardship should not be considered by a court when the employer has not met its burden of coming forward with evidence of attempts at reasonable accommodation.

In support of this position Toledo cites language from a decision of this court and from decisions of a number of other courts of appeals.[4] For example, in *Williams v. Southern Union Gas Co.*, 529 F.2d 483, 489 (10th Cir.), *cert. denied*, 429 U.S. 959, 97 S.Ct. 381, 50 L.Ed.2d 325 (1976), we stated that the employer "had a duty to at least try to accommodate [the plaintiff's] religious practices." Toledo acknowledges, however, that one could infer from language in another of our cases that an employer may show reasonable accommodation *or* undue hardship. *See Pinsker*, 735 F.2d at 390 ("Simply put, Title VII requires reasonable accommodation or a showing that reasonable accommodation would be an undue hardship on the employer.").

We are not convinced that these two quotations are inconsistent as a practical matter, because neither was dispositive of any issue in the case. Both cases affirmed lower court holdings for employers based on findings of reasonable accommodation and thus were not concerned with the proper way to deal with cases involving no attempt at accommodation. Because we can find no indication in either opinion that the panel intended to resolve this issue, we turn to the merits.

Nobel's position is in line with that taken explicitly by the Sixth Circuit:

> "[I]t is possible for an employer to prove undue hardship without actually having undertaken any of the possible accommodations, and we must determine whether the [employer] has made such showing in this case."

*Draper v. United States Pipe & Foundry Co.*, 527 F.2d 515, 520 (6th Cir.1975); *see also Pyro Mining Co.*, 827 F.2d at 1086. We believe this is the more reasonable approach, for it is certainly conceivable that particular jobs may be completely incompatible with particular religious practices. It would be unfair to require employers faced with such irreconcilable conflicts to attempt futilely to resolve them. Employers faced with such conflicts should be able to meet their burden by showing that no accommodation is possible.

---

**4.** Language from two Ninth Circuit opinions arguably supports Toledo's position. *See Anderson v. General Dynamics Convair Aerospace Div.*, 589 F.2d 397, 401 (9th Cir.1978) ("the burden was thereafter upon [the employer] and the Union to prove that they made good faith efforts to accommodate [the employee's] religious beliefs and, if those efforts were unsuccessful, to demonstrate that they were unable reasonably to accommodate his beliefs without undue hardship."), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Burns v. Southern Pac. Transp. Co.*, 589 F.2d 403, 406 (9th Cir.1978) ("Once the employer has made more than a negligible effort to accommodate the employee and that effort is viewed by the worker as inadequate, the question becomes whether the further accommodation requested would constitute 'undue hardship.' ") (citation omitted), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979). In both of these cases, however, the court went on to address and reject the claim that any accommodation would constitute undue hardship as a matter of law.

Although conceivable, such situations will also be rare. We therefore will be "skeptical of hypothetical hardships." *Draper*, 527 F.2d at 520. "The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted." *Id.* Indeed, deciding the issue of undue hardship without some background of attempted or proposed accommodation is best resolved by examining the specific hardships imposed by specific accommodation proposals:

> "With other courts, we recognize that the determination 'whether a particular accommodation works an undue hardship on either an employer or union must be made by considering "the particular factual context of each case." ' "

*Protos*, 797 F.2d at 134 (*quoting Tooley v. Martin–Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir.), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981)).

Accordingly, we hold that an employer who has made no efforts to accommodate the religious beliefs of an employee or applicant before taking action against him may only prevail if it shows that no accommodation could have been made without undue hardship. Absent this showing, failure to attempt some reasonable accommodation would breach the employer's duty to initiate accommodation of religious practices.

On appeal, Nobel asserts three arguments supporting the claim that no accommodation is possible in this case. First, it claims that hiring an active member of the Native American Church would place it in violation of Federal Department of Transportation (DOT) regulations regarding drug use by truck drivers. Second, it claims that any use of peyote is illegal, and that hiring a user of an illegal drug would violate its own policies and its truck lease agreement. Finally, it claims that knowingly hiring a peyote user would expose it to unacceptable liability risks. We address each argument in turn.

■ Nobel claims here, as it did at trial, that DOT regulations made hiring Toledo illegal. The relevant regulation in effect at the time of Toledo's application stated:

> "(a) No person shall operate, or be in physical control of, a motor vehicle if he possesses, is under the influence of, or is using, any of the following substances:
> (1) A narcotic drug or any derivative thereof;
> (2) An amphetamine or any formulation thereof (including, but not limited to, 'pep pills' and 'bennies');
> (3) Any other substance, to a degree which renders him incapable of safely operating a motor vehicle."

49 C.F.R. § 392.4 (1983).

The district court correctly noted that although peyote is neither a narcotic nor an amphetamine, it could render a driver "incapable of safely operating a motor vehicle" and thus falls under subsection (3) of the regulation. The court also correctly "interpret[ed] the regulation to prohibit possession, driving under the influence of, or use (consumption) of peyote while operating or physically controlling a truck. It does not prohibit use or possession while off duty." *Toledo*, 651 F.Supp. at 489. The court found that Toledo never used peyote outside of religious ceremonies, and that Nobel could have ensured compliance with the regulation by requiring Toledo to take a day off after each ceremony. This finding of fact is not clearly erroneous, and we do not disturb it on appeal. *See Pyro Mining*, 827 F.2d at 1089; *Protos*, 797 F.2d at 134–35; *Turpen*, 736 F.2d at 1026; *Williams*, 529 F.2d at 489.

The district court's reasoning with respect to the amended version of the regulation, which took effect on December 5, 1984, is similarly correct. The amended version reads: "(a) No driver shall be on duty and possess, be under the influence of, or use, any of the following drugs or other substances: (1) any Schedule I drug or substance identified in Appendix D to this subchapter...." 49 C.F.R. § 392.4(1) (1987). Although peyote is included as a Schedule I substance, the new regulation still prohibits only on-duty conduct. The same accommodation would keep Nobel

and Toledo in compliance, and allow Toledo to continue his religious practices.

■ Nobel argues next that peyote is an illegal drug, and that hiring a user of an illegal drug would violate its own policies and its truck lease agreement with Ryder Trucks. The district court rejected this argument by noting that although peyote is a Schedule I illegal drug under the Controlled Substance Act of 1970, 21 U.S.C. § 812(c) Schedule I(c)(12) (1982), religious use of peyote by members of the Native American Church has been made legal by regulation. *See* 21 C.F.R. § 1307.31 (1988) ("The listing of peyote as a controlled substance in Schedule I does not apply to the nondrug use of peyote in bona fide religious ceremonies of the Native American Church...."); *see generally Employment Div., Dep't. of Human Resources v. Smith,* 485 U.S. 660, 108 S.Ct. 1444, 1451 n. 15, 99 L.Ed.2d 753 (1988); *Peyote Way Church of God,* 742 F.2d at 197–98; *Native American Church of New York,* 468 F.Supp. at 1248. Bona fide religious use of peyote is also explicitly made legal by statute in New Mexico and Colorado, the two states in which Toledo would have driven. *See* N.M.Stat.Ann. § 30–31–6(D) (1987); Colo.Rev.Stat. § 12–22–317(3) (1985).

The district court disposed of Nobel's argument as follows:

"Nobel's lease with Ryder, from whom it leased all its trucks, provided that Ryder could remove any driver, cancel its lease or cancel its insurance if any driver used drugs or operated trucks under the influence of drugs which impair the driver's ability to operate the truck. The Ryder Safety Manual also prohibited 'drug abuse'. As indicated above, Toledo's use of peyote was not an illegal use, so did not violate Nobel policy. By requiring Toledo to take a day off after each use of peyote, Nobel would have been complying with the Ryder lease terms on use or being under the influence of drugs while on the job. Toledo's religious use was not drug abuse. Therefore, neither Nobel nor Ryder policies prevented Nobel from hiring Toledo with the reasonable restriction of requiring Toledo to take a day off after each use."

*Toledo,* 651 F.Supp. at 491. The meaning of the federal regulation and New Mexico statutory exemption are evident and undisputed. A review of the record has convinced us that the district court's findings regarding the Ryder lease and Nobel policy are not clearly erroneous.

■ The only argument left to Nobel, and the one which figures most prominently in its brief, is that the regulatory exemption of peyote, promulgated by the Attorney General, exceeded the Attorney General's regulatory authority under the statute. Nobel claims that the Attorney General may only employ criteria set out in the 1970 statute in exempting substances from Schedule I, and that the religious exemption is not supported by any of these criteria. Nobel also argues the Attorney General does not have power to make partial exemptions under the statute.

We note initially that considerable legislative history, some cited by the trial court, indicates that when Congress passed the 1970 statue, it did so intending that the exemption contained in the previous statute for peyote use associated with the Native American Church be preserved by regulation. *See Toledo,* 651 F.Supp. at 490; *see also Native American Church of New York,* 468 F.Supp. at 1250–51 (discussing legislative history). More importantly, two criteria appear in the statute which would justify the regulatory exemption:

"In making any finding under subsection (a) of this section or under subsection (b) of section 812 ..., the Attorney General shall consider the following factors with respect to each drug or other substance proposed to be controlled or removed from the schedules:

"(1) Its actual or relative potential for abuse.

" ...

"(4) Its history and current pattern of abuse.

" ...."

21 U.S.C. § 811(c) (1982). Both the lessened potential for abuse in the religious context and the history of religious use of

peyote support the exemption. We therefore reject Nobel's argument, and agree with the district court's disposition of this claim of undue hardship.

■ Nobel's final claim of undue hardship is that hiring a known user of peyote would expose Nobel to the risk of increased tort liability should Toledo cause an accident while in its employ. The district court rejected this argument on two grounds: that Toledo's known peyote use would not expose Nobel to new lawsuits, but only to additional liability in suits that already could be brought against it under the doctrine of *respondeat superior;* and that the legality of peyote and restrictions on Toledo's work after ceremonies would virtually eliminate this risk. *See Toledo*, 651 F.Supp. at 491. Nobel responds that this holding does not adequately consider all the nuances of the tort of negligent entrustment and Nobel's potential exposure to punitive damages.

■ An accommodation that requires an employer to bear more than a "de minimis" burden imposes undue hardship. *See Trans World Airways*, 432 U.S. at 84, 97 S.Ct. at 2276. Any proffered hardship, however, must be actual; "[a]n employer ... cannot rely merely on speculation." *Pyro Mining*, 827 F.2d at 1086; *see also Tooley v. Martin–Marietta Corp.*, 648 F.2d 1239, 1243 (9th Cir.) ("A claim of undue hardship cannot be supported by merely conceivable or hypothetical hardships....

The *magnitude* as well as the *fact* of hardship must be determined by examination of the facts of each case."), *cert. denied*, 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981).

We are convinced that the risks of increased liability created by hiring Toledo are too speculative to qualify as undue hardship. As the district court found, accommodating Toledo's practices by requiring him to take a day off after each ceremony would virtually eliminate the risk that the influences of peyote would cause an accident or be a factor in subsequent litigation. This finding in turn depends on the district court's previous factual determinations that the doses of peyote Toledo ingested at ceremonies would have dissipated after a day's rest. *See Toledo*, 651 F.Supp. at 487, 489, 491. These findings are all well supported by the record and are not clearly erroneous.

Nobel failed to show that accommodation of Toledo's practices without undue hardship was impossible. Its refusal to hire him therefore constituted a violation of Title VII's prohibition against employment discrimination based on religion.[5]

### III.

### BACK PAY

The district court reached two distinct conclusions with respect to backpay. First, it held that "[s]ince Toledo turned down the

---

5. As the discussion in Part IIC on undue hardship indicates, the instant case is clearly distinguishable from *Smith v. Employment Div.*, 307 Or. 68, 763 P.2d 146 (1988), *cert. granted,* —— U.S. ——, 109 S.Ct. 1526, 103 L.Ed.2d 832 (1989). In *Smith*, a county employee was discharged from his position as an alcohol abuse counselor for the off-duty religious use of peyote, and was subsequently denied unemployment compensation. Smith contended that the state's denial of benefits impermissibly burdened his right to the free exercise of his religion guaranteed by the First Amendment. The Oregon Supreme Court agreed, holding:

"We conclude that the Oregon statute against possession of controlled substances, which include peyote, makes no exception for the sacramental use of peyote, but that outright prohibition of good faith religious use of peyote by adult members of the Native American

Church would violate the First Amendment directly and as interpreted by Congress. We therefore reaffirm our holding that the First Amendment entitles petitioners to unemployment compensation."

*Id.* 763 P.2d at 148 (footnote omitted). The Supreme Court granted certiorari to consider whether the First Amendment's Free Exercise Clause protects a person who uses peyote for religious purposes from prosecution under a state criminal statute. *See* 57 U.S.L.W. 3593.

In the instant case, no state action is involved and the First Amendment is therefore not implicated. Instead, the issue is whether Nobel's conduct violates Title VII. Moreover, and more importantly for purposes of the specific arguments Nobel raises here, while the religious use of peyote is subject to criminal prosecution in Oregon, it is exempt from prosecution in all jurisdictions with any relevance to this case. *See supra* at 1491.

[July 10] offer to be hired, the only possible damages owed to Toledo are four months of back wages reduced by the amount Toledo earned during that time." *Toledo*, 651 F.Supp. at 492. The court thus held that the July 10 offer tolled Nobel's liability for backpay. Second, the court concluded that Toledo failed to prove the appropriate amount of backpay at trial. Toledo questions both of these conclusions.

■■■■■ It is true "that a Title VII claimant's rejection of a defendant's job offer normally ends the defendant's ongoing responsibility for backpay." *Ford Motor Co.*, 458 U.S. at 241, 102 S.Ct. at 3070. Under *Ford*, however, this rule applies only if the offer of employment is not conditioned on dropping the Title VII claim. *Id.* at 232 n. 18, 102 S.Ct. at 3066 n. 18; *see also Figgs v. Quick Fill Corp.*, 766 F.2d 901, 903 (5th Cir.1985). As we have previously noted, Nobel's offer to Toledo was conditioned on Toledo dropping his claim, as well as his passing a polygraph test and physical examination. Because the offer was not unconditional, the district court erred in concluding that Nobel could potentially be liable for backpay covering only the four-month period before the offer. Moreover, a rejected offer of reinstatement does not end ongoing backpay liability if the claimant's rejection of the offer was reasonable given the form of the offer and the circumstances surrounding it. *See Giandonato v. Sybron Corp.*, 804 F.2d 120, 124 (10th Cir.1986); *see also Kilgo v. Bowman Transp., Inc.*, 789 F.2d 859, 879 (11th Cir.1986) (holding that invitation to apply for position is not unconditional offer of employment, and citing cases); *Orzel v. City of Wauwatosa Fire Dept.*, 697 F.2d 743, 757 (7th Cir.) (offer to reinstate age discrimination claimant conditioned on claimant passing physical did not toll backpay liability where claimant reasonably believed that employer considered him physically unqualified), *cert. denied*, 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983).

■■■■ The district court also stated that Toledo failed to establish at trial the "four months of back wages reduced by the amount Toledo earned during that time."

*Toledo*, 651 F.Supp. at 492. The relevance of this statement is compromised by our holding that Nobel is liable for backpay past the July 10 settlement offer. In addition, the legal and factual basis for the statement is unclear. Toledo cites to evidence in the record from which both his backpay and interim earnings could be calculated. *See* rec., vol. 2, at 317; Def. Ex. P, Jt. App. at 124–26. Nobel does not dispute this evidence. Instead, it interprets the district court's statement as indicating that Toledo did not prove the amount of unemployment compensation he received during the four month period. However, Nobel's own exhibit P lists Toledo's unemployment compensation for the period from March 12, 1984, to July 1, 1984, as $2,320.00. Moreover, the amount of unemployment compensation Toledo received is not essential to ascertaining backpay because it is within the district court's discretion whether to discount a backpay award by the amount of unemployment compensation earned by the claimant during the relevant period. *See EEOC v. Sandia Corp.*, 639 F.2d 600, 624–26 (10th Cir.1980).

Accordingly, we must remand for a determination of backpay liability under the proper standards. In assessing the amount of the award to which Toledo is entitled, the court should not consider the July 10 offer as tolling liability. In addition, the court should take into consideration that once a plaintiff has established a violation and presented evidence on damages, "the employer has the burden of showing that the discriminatee did not exercise diligence in mitigating the damages caused by the employer's illegal actions." *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 937 (10th Cir.1979).

## IV.

## RACE AND NATIONAL ORIGIN DISCRIMINATION

■■■■ In his complaint, Toledo asserted a claim of race and national origin discrimination under both Title VII and 42 U.S.C. § 1981. Specifically, paragraph 17 of the complaint states:

"Defendant's refusal to hire plaintiff because of plaintiff's sincere religious use of peyote in connection with the bona fide religious activities of the Native American Church constitutes discrimination on the basis of race and national origin, in violation of 42 U.S.C. §§ 1981, 2000e–2(a)."

Rec., vol. I, doc. 1 at 3. The district court granted summary judgment in favor of Nobel on these claims after concluding that Toledo failed to assert facts supporting his claim that Nobel's refusal to hire him was due to his race or national origin.[6]

On appeal of a grant of a summary judgment motion, this court will review the record in the same manner as the district court, and interpret the evidence in the light most favorable to the non-moving party. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265.

To prove his Title VII claim, Toledo had the initial burden to establish, by a preponderance of the evidence, that he is a member of a racial minority, that he was qualified for the position and was rejected, and that after he was rejected Nobel either continued to seek applicants for the position or filled the position with a non-minority employee. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In his complaint, Toledo alleged that Nobel refused to hire him "solely" because of his peyote use. Nowhere in his complaint did he assert any racial animus; nowhere in the summary judgment record did he point to evidence of any racial animus. He did not plead or present evidence that the driver position

was filled by a non-minority. Throughout the proceedings he argued that the "no peyote" requirement is a form of discrimination against Native Americans. Without supporting allegations or evidence of racial animus apart from the desire for peyote-free drivers, the district court was correct in granting Nobel summary judgment.[7]

V.

## CONCLUSION

We reverse the holding of the district court relieving Nobel of liability for its discriminatory failure to hire Toledo. By failing to accommodate Toledo's religious practices before refusing to hire him, Nobel violated Title VII. The district court also erred in concluding that the July 10 settlement offer tolled Nobel's backpay liability. The case is remanded to the district court for a determination of appropriate remedies. The award of fees to Nobel as prevailing party is accordingly reversed. The district court, on motion of the parties, may revisit the fees issue in light of the disposition of this appeal and any further proceedings below.

REVERSED AND REMANDED.

---

6. Toledo has abandoned his claim under 42 U.S.C. § 1981 on appeal, pursuing only his Title VII claim.

7. Toledo argues on appeal that the trial court erred in failing to employ disparate impact analysis to the Title VII claim. Toledo did not

argue this theory to the district court, however, and we therefore will not consider it on appeal. *See Anschutz Land & Cattle Co. v. Union Pac. R.R.*, 820 F.2d 338, 344 n. 5 (10th Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 347, 98 L.Ed.2d 373 (1987).