**Helen Louise WEILERT, Plaintiff,**

v.

**HEALTH MIDWEST DEVELOPMENT GROUP, d/b/a Allen County Hospital, Defendant.**

No. Civ.A. 99–2107–CM.

United States District Court, D. Kansas.

April 13, 2000.

Jerald R. Long, Mission, KS, for Helen Louise Weilert, plaintiff.

Jack L. Whitacre, Jeffrey M. Place, Spencer, Fane, Britt & Browne, Kansas City, MO, for Health Midwest Development Group, defendant.

## MEMORANDUM AND ORDER

MURGIA, District Judge.

This matter is before the court on defendant's motion to strike and for extension of time (Doc. 56) and motion for summary

judgment (Doc. 50). The motion for extension of time is moot. The motions to strike and for summary judgment are denied for reasons discussed herein.

## I. MOTION TO STRIKE AND FOR EXTENSION OF TIME

Defendant, Health Midwest Development Group (Midwest), made a motion requesting the court to strike certain portions of the plaintiff's, Ms. Weilert's, response to Midwest's motion for summary judgment. Midwest also requested leave to reply to Ms. Weilert's memorandum ten days after the court decides the motion to strike. Midwest was subsequently granted leave to file its reply brief out of time. Therefore, Midwest's motion for an extension of time is moot.

Ms. Weilert filed a response to Midwest's summary judgment motion containing 269 numbered paragraphs of additional facts precluding summary judgment, and an "Argument" section which Midwest contends is 32 pages in length, thereby exceeding the 30–page limit established by the scheduling order. Further, it alleges that Ms. Weilert's statements of fact are cumulative and repetitive summaries of deposition testimony. Midwest argues that the paragraphs are not **concise** statements of **material** facts which are at **issue** in this case. Midwest contends that, as a result Ms. Weilert has violated D.Kan. Rule 56.1, and the paragraphs should be stricken. According to Midwest, it would be a waste of resources to respond to these cumulative and repetitive contentions of fact since the issue before the court is legal.

Ms. Weilert responds that her "Argument" section exceeds the limit by only two pages. She argues that the font of her memorandum provides approximately 65 characters per line, while that used by Midwest provides approximately 95 characters per line. She requests that the court accept her memorandum as written, or allow her to resubmit it in a smaller font. With regard to the 269 paragraphs of additional facts, she argues that fact issues are dispositive of this summary judgment motion. Because Ms. Weilert took the statements of fact directly from deposition testimony, she argues that it cannot be too burdensome to admit or controvert the facts. Alternatively, she argues that the court should not strike those statements to which she specifically refers in the "Argument" section of her memorandum.

### A. Page Limit

■ The "Argument" section begins on page 49 approximately one inch from the top margin, and ends on page 77 over two inches from the bottom margin. By the court's calculation, the section is 28 and two-thirds pages long. The memorandum contains a "Conclusion" which is over three pages long. The defendant includes the "Conclusion" when asserting that the "arguments and authorities" section is over 30 pages long. Midwest cites no basis for including the "Conclusion" section in its page count, and Ms. Weilert does not object. But the court finds Ms. Weilert has not exceeded the page limit.

Even if the court determined that Ms. Weilert's "Argument" section exceeded the page limit by approximately two pages, it is not inclined to strike the excess. Judicial economy and concise argument are purposes of the page limit. Judicial economy is not served when the court or the parties engage in counting the approximate characters per line in the parties' memoranda. Concise argument is not served by changing the font used. However, the court notes that Midwest used a font which produces more characters per line than does the font used by Ms. Weilert. If the court were to allow Ms. Weilert to resubmit her memorandum in a smaller font producing approximately 95 characters per line, it is reasonable to assume that her "Argument" and "Conclusion" sections would be reduced, and likely fit within the page limit. Midwest's motion to strike the "excess" is frivolous and will not be granted.

## B. Statements of Fact

A review of Ms. Weilert's statements of fact reveals they are cumulative, repetitive, poorly organized, and—in the aggregate—anything but concise. She would have aided the court and Midwest had she made a statement of fact and then cited every place in the record where it can be supported. Instead, she chose to look at depositions and make each statement of fact which could be supported from that testimony. Consequently, where multiple testimony supports a fact, the fact appears multiple times.

However, the other requirements of the local rule are met. Ms. Weilert states the number of each of the movant's facts which she disputes. She separately numbers each statement of fact, cites to the portion of the record upon which she relies in her statement, and generally supports each fact by affidavit, declaration or deposition. Not every statement presents a genuine issue of material fact which would preclude summary judgment, but that is often the case in memoranda opposing summary judgment. Courts generally do not make it a practice to strike every statement which does not present a genuine issue of material fact. Rather, courts merely recognize that a genuine issue of material fact is not present and decide based upon the law.

■ Midwest requests that **all** of Ms. Weilert's statements be stricken because she was not as concise as she could have been, and perhaps should have been, in complying with Local Rule 56.1. The court will use its discretion in applying local rules to the case before it. *See Amro v. Boeing Co.,* 153 F.3d 726, 1998 WL 380510 at *1 n. 1 (10th Cir.1998) (Table); *accord Glover v. Heart of Am. Management Co.,* 38 F.Supp.2d 881, 883 (D.Kan. 1999). To strike a portion of a memorandum is a drastic measure which the court will apply only if the movant shows prejudice from a failure to strike. *See Kay–Cee Enterprises, Inc. v. Amoco Oil Co.,* 45 F.Supp.2d 840, 842 n. 1 (D.Kan.1999).

■ Midwest can show no prejudice if the statements are not stricken. Midwest's argument, that it cannot respond to such an extensive list, fails for two reasons. First, Midwest filed a reply in which it responded to "the few 'additional paragraphs' that might be relevant to the issues of law before the Court, and that are inconsistent with the testimony on record, even when the testimony is viewed in the light most favorable to the Plaintiff." (Def.'s Reply at 2). Midwest has reviewed the statements, determined—in its opinion—which are relevant, and responded. Any argument concerning waste of resources is moot. Second, if the statements are stricken, Ms. Weilert will be deprived of the opportunity to present the record which supports her arguments. Such a ruling would be prejudicial to Ms. Weilert, and the court would be compelled to search the record itself for genuine issues of material fact precluding summary judgment. *See Amro,* 153 F.3d 726, 1998 WL 380510 at *1, n. 1 (*citing Downes v. Beach,* 587 F.2d 469, 471 (10th Cir.1978) (the court may make an "assiduous review of the record," to determine a summary judgment motion)). Midwest's motion to strike is denied.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *See Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *See id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *See Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. FACTS

The following facts are undisputed or viewed in the light most favorable to Ms.

Weilert. Ms. Weilert worked as a registered nurse in the Allen County Hospital (Midwest) from 1977 until March 1997. Ms. Weilert began attending classes in August 1996 in preparation to join the Catholic church, of which her husband was a long-time member. She was to be initiated or confirmed in the church on Easter weekend of 1997. Some of the activities involved in joining the church conflicted with Ms. Weilert's work schedule.

Midwest schedules its nurses several weeks in advance, using a regular rotating schedule, which normally requires its nurses to work every other weekend. A nurse may seek release from scheduled work to meet personal needs pursuant to several policies. First, Midwest provides paid vacation to its nurses who have more than six months service. The nurse must submit a written request to take vacation. Further, Midwest allows its nurses to swap scheduled work shifts, or parts of shifts, with the approval of management. Finally, nurses may also request "first low census." "Low census" is a procedure whereby Midwest sends nurses home when there are more nurses working than the patient load requires. If a supervisor decides that the work load does not require all of the staff present, he will send someone home. He may release a nurse who has requested "first low census." A "first low census" request does not insure that the nurse will be allowed to leave work early.

Before March 29, 1997, nurses were at times allowed, for personal reasons, to leave early without arranging a replacement. For example, one left early on several occasions to attend college classes. Other reasons included: taking children to school functions; going to a dental appointment; picking up children; and, attending children's functions. In these circumstances, if a nurse did not get a replacement, that nurse might not be allowed to leave early depending upon the needs of Midwest.

Ms. Weilert participated in a Rite of Election ceremony on Sunday, February 16, 1997, in connection with joining the church. She had been scheduled to work, but arranged for a shift swap with another nurse. She submitted a written request to the nursing department secretary, Clara Stifter. The request was approved by management, and the other nurse worked Ms. Weilert's scheduled shift.

Ms. Weilert mistakenly thought her confirmation would take place on Easter Sunday, March 30, 1997. She was scheduled to work that weekend, and sought, unsuccessfully, to swap the Sunday shift with three other nurses. She did not request vacation on Easter Sunday, nor did she attempt to contact any nurses beyond the three. In February or March of 1997, Ms. Weilert told Ms. Stifter that she was not able to get anyone to work for her on Easter and she wanted "first low census" that day.

On, March 23, Ms. Weilert learned that her confirmation was actually scheduled for Holy Saturday, March 29. The following day, Ms. Weilert told Ms. Stifter that she would not need "first low census" on Easter Sunday, but would instead need to leave a little early on Saturday. Ms. Stifter did not verbally respond, but acknowledged by nodding her head. Thereafter, Ms. Weilert did not seek to get vacation or to trade shifts with any other nurses, nor did she further discuss her needs with any supervisor until she arrived to work on Saturday, March 29, 1997.

That day, Ms. Weilert reported to work and spoke with her supervisor, John Hancock, about her need to leave work early. She asked if the schedule noted her need. Mr. Hancock said it was not noted and asked who would be coming in to replace her. She said that she had not found a replacement and explained that she was to be confirmed in the Catholic church that day. Mr. Hancock stated that Ms. Weilert could not leave without a replacement, and

Ms. Weilert responded that the law required him to allow her to leave early to attend the service. Mr. Hancock said he would check into her claim. Immediately after the meeting with Ms. Weilert (the Morning Meeting), Mr. Hancock came out of his office and commented that there was no way Ms. Weilert was leaving early. Later in the day, Mr. Hancock allegedly made rude comments to other staff members about Ms. Weilert's leaving early to go to church.[1]

That afternoon, Mr. Hancock called Ms. Weilert in to talk about her request to leave early. Mr. Hancock explained that he had spoken with the Director of Human Resources and that if Ms. Weilert left early, she would be subject to discipline. Ms. Weilert again asserted that he could not keep her from attending a religious service. Later in the day, Ms. Weilert taped her report for the next shift, passed her patients to an LPN, briefed an RN on her patients' Intra-Venous needs, and, at 5:40 p.m., clocked out.

Sunday morning, when Ms. Weilert reported to work, Mr. Hancock sent her home and told her she would be contacted the next day by the Director of Nursing. On Monday, Ms. Weilert was called in. She was told that Midwest believed she had abandoned her position and had resigned by walking off the job. She was also told that she had been fired for negligence affecting the safety of a patient.

## IV. TITLE VII STANDARD FOR RELIGIOUS DISCRIMINATION

▆ Pursuant to Title VII, it is "an unlawful employment practice for an employer ... to discharge ... or discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... religion." 42 U.S.C. § 2000e–2(a)(1). "Religion" is defined to include those aspects of religious observance and

---

1. Midwest does not address Ms. Weilert's statement of fact # 109, but the portions of

the record cited by Ms. Weilert support the statement.

practice that an employer is able to "reasonably accommodate ... without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). It is a violation of Title VII for an employer not to make reasonable accommodation of an employee's religious observance unless to do so would present an undue hardship on the employer's business. *See Toledo v. Nobel–Sysco, Inc.,* 892 F.2d 1481, 1486 (10th Cir. 1989) (*quoting Pinsker v. Joint Dist. No. 28J,* 735 F.2d 388, 390 (10th Cir.1984)).

█ The Tenth Circuit has adopted a two-step analysis in such cases. First, the plaintiff has the burden of establishing a prima facie case of religious discrimination by showing: (1) she holds a bona fide religious belief that conflicts with a requirement of her employment, (2) she informed the employer of the belief, and (3) she was fired because she did not comply with the conflicting employment requirement. *See Toledo,* 892 F.2d at 1486. If the plaintiff establishes a prima facie case, the burden shifts to the employer to show that it was unable to accommodate the plaintiff without undue hardship on its business. *See id.*

The employer must show either that it made a reasonable accommodation, or that reasonable accommodation would be an undue hardship. *See Lee v. ABF Freight System, Inc.,* 22 F.3d 1019, 1022 (10th Cir.1994). Where an employer offers a reasonable accommodation, the inquiry ends. Undue hardship is an issue only where the employer claims it cannot offer any reasonable accommodation. *See Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 68–69, 107 S.Ct. 367, 93 L.Ed.2d 305 (1986).

A court determines whether an accommodation is reasonable based upon the facts and circumstances of the case. *See United States v. Albuquerque,* 545 F.2d 110, 114, 115 (10th Cir.1976) ("[I]n a sense every case boils down to a determination as to whether the employer acted reasonably."). A number of circuits have determined that a reasonable accommodation is one which eliminates the conflict between the employee's religious practice and her work requirement. *See, e.g., Rodriguez v. Chicago,* 156 F.3d 771, 775 (7th Cir.1998); *Cooper v. Oak Rubber Co.,* 15 F.3d 1375, 1380 (6th Cir.1994); *EEOC v. Hanson–Loran Co.,* 21 F.3d 1112, 1994 WL 109662 at *3 (9th Cir.1994) (Table).

█ Title VII requires a reasonable accommodation, not an accommodation of the employee's choosing. *See, e.g., Rodriguez,* 156 F.3d at 776; *Lee,* 22 F.3d at 1022; *Pinsker,* 735 F.2d at 390–91. However, an accommodation is not reasonable when an employee's preferred accommodation is permitted for all purposes except religious ones. *See Ansonia Bd. of Educ.,* 479 U.S. at 70–71, 107 S.Ct. 367 ("A provision for paid leave 'that is part and parcel of the employment relationship may not be doled out in a discriminatory fashion, even if the employer would be free ... not to provide the benefit at all.'") (*quoting Hishon v. King & Spalding,* 467 U.S. 69, 75, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). The employer and employee have a bilateral duty to cooperate in seeking a reasonable accommodation. *See Ansonia Bd. of Educ.,* 479 U.S. at 69, 107 S.Ct. 367. However, the statutory burden to accommodate is on the employer. The employee's duty to cooperate is not triggered until the employer makes an initial effort to accommodate. *See, Toledo,* 892 F.2d at 1488–89.

## V. ANALYSIS

Midwest concedes that Ms. Weilert has presented a prima facie case of religious discrimination. Midwest suggests that its policies of paid vacation and shift swapping constitute reasonable accommodations for Ms. Weilert's conflict, and no further inquiry is therefore necessary. Ms. Weilert does not deny that the policies might constitute reasonable accommodation but argues that, in the circumstances of this case, they are not.

## A. "One–Shot" Accommodation

■ Ms. Weilert's first argument is that Midwest **must** provide a different accommodation where the employee has a conflict between a work requirement and a religious observance that is a "one-shot" occurrence (like a confirmation) not amenable to resolution through the normal accommodation process. Because Midwest offered an accommodation, Ms. Weilert had a duty to cooperate in the process. She made no efforts whatsoever to use vacation or to seek a replacement for the time she wanted off on **Saturday,** March 29, and thereby breached her duty to cooperate. Ms. Weilert may not argue that Midwest's proffered accommodation is unreasonable.

Ms. Weilert had only one week to seek accommodation after she learned the actual date of her confirmation. The court takes notice that many employees will not desire to work on a holiday weekend and that many employers will not grant a short-notice request for vacation after a holiday weekend schedule has been published. Had she made a good faith effort and failed in her attempt to seek vacation time or a shift swap, Ms. Weilert's argument that Midwest must provide a one-shot accommodation might be persuasive. That is not the case here. Ms. Weilert may not argue the impossibility of the situation because she did not attempt to utilize the proffered accommodation. Ms. Weilert may not assert an absolute right to a different accommodation. However, the inquiry does not end there.

## B. "Leave Early" Practice

Ms. Weilert further argues that Midwest's practice of allowing employees to leave early to take care of personal business was administered in a discriminatory fashion, thereby violating Title VII's prohibition against religious discrimination and making Midwest's insistence on its proffered accommodations unreasonable. Midwest admits that it has a "low census" policy whereby employees may be allowed to leave early based upon the medical needs of the hospital. Ms. Weilert argues that Midwest has a practice of allowing employees to leave early for personal reasons. It is not clear whether the parties refer to the same policy, or whether the "leave early" practice is in dispute.

To the extent Midwest may argue it has no "leave early" practice, suffice it to say that Ms. Weilert has produced evidence sufficient to present a genuine issue of fact whether such a practice exists. Therefore, for purposes of summary judgment, the court infers such a practice. Ms. Weilert may argue the alleged "leave early" practice is not administered subject to the medical needs of the hospital. However, she admits that other employees were refused permission to "leave early" on occasion, and that she might have to remain for her full shift on the day in question if "low census" was inappropriate. Midwest's alleged "leave early" practice was subject to the medical needs of the hospital. The court finds the analysis is the same whether it considers the issue from the perspective of the "low census" policy or the "leave early" practice.

■ If an employee's preferred accommodation is administered in a discriminatory fashion, the employer's proffered accommodation is not reasonable, even though the employer is free not to offer **any** accommodation. *See Ansonia Bd. of Educ.,* 479 U.S. at 71, 107 S.Ct. 367. In this case, Ms. Weilert's preferred accommodation was use of the "low census" policy. If Midwest applied the policy in a discriminatory fashion, it would be unreasonable as a matter of law for Midwest to insist that Ms. Weilert use one of the proffered accommodations—paid vacation or shift swap. In the circumstances of this case, the court finds a question of fact whether the "low census" policy was applied in a discriminatory fashion.

## C. Discriminatory Administration of the "Low Census" Policy

Discriminatory animus is critical to a determination of discrimination. *See In-*

*ternational Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). If Midwest's decision was based on the religious nature of the request, Midwest has discriminated with respect to Ms. Weilert's privileges of employment because of her religion. Such conduct is prohibited by Title VII. Ms. Weilert presented evidence that immediately after the Morning Meeting, Midwest's decision-maker, Mr. Hancock, told other employees there was no way Ms. Weilert was going to leave early. Later, he made rude comments to other employees about Ms. Weilert's request to leave early to go to church. When Ms. Weilert said she believed the law required that he release her early, he reacted by taking an inflexible position. He made his decision immediately, eight or ten hours before it was necessary to decide. A reasonable jury might infer from those facts, if proven, that Mr. Hancock did not wait to evaluate the needs of the hospital. A jury could find that his decision was based upon an unlawful motive—the religious nature of the request—not the needs of the hospital. Although the evidence is not conclusive, nor even particularly strong, the court may not weigh the evidence at this stage, and must draw all inferences in favor of the party opposing summary judgment.

Midwest argues that Ms. Weilert has not shown that other employees who were allowed "low census" were similarly situated, nor has she provided evidence that the reasons given by Midwest for not granting her "low census" request, and for firing her, were pretext. Midwest's argument fails to account for the rule that a plaintiff may prove discriminatory animus directly. *See Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 550 (10th Cir.1999); *accord Miller v. Maddox*, 51 F.Supp.2d 1176, 1188 (D.Kan.1999). "To prevail via this direct method, a plaintiff must introduce direct or circumstantial evidence that the alleged [discriminatory] motive 'actually relate[s] to the question of discrimination in the particular employment decision.'" *Medlock*, 164 F.3d at 550. Since Ms. Weilert's

evidence directly relates to the discriminatory animus of Mr. Hancock in not allowing her "low census" request, she need not show that employees treated differently were similarly situated. Additionally, if the jury believes Ms. Weilert's facts, it could find that Midwest's reasons are a pretext. There is a question of fact whether Midwest's decision not to allow Ms. Weilert to leave early was motivated by discriminatory animus based upon the religious nature of the request. Therefore, summary judgment is not proper.

**IT IS THEREFORE ORDERED** that Midwest's motion for summary judgment (Doc. 50) is denied.

**IT IS FURTHER ORDERED** that Midwest's motion to strike and for extension of time (Doc. 56) is deemed moot in so far as it relates to an extension of time, and is denied in so far as it relates to striking portions of the plaintiff's memorandum.